HAROLD BERNSTEIN *vs.* GRAMERCY MILLS, INC.

Suffolk. March 18, 1983. — July 28, 1983.

Present: BROWN, KAPLAN, & DREBEN, JJ.

*Arbitration,* Vacating award. *Practice, Civil,* Counterclaim. *Pleading, Civil,* Counterclaim. *Statute,* Construction.

Commencement of an action to confirm an arbitrator's award did not postpone or extend the time limited by G. L. c. 251, § 12, within which a party may make an application to vacate the award. [406-408]

The fact that an arbitrator's award was attacked by way of a counterclaim in an action previously brought to confirm the award did not permit a party to escape the time limitation of G. L. c. 251, § 12, on applications to vacate the award. [408]

Language in G. L. c. 260, § 36, providing that "compulsory" counterclaims may be asserted without regard to provisions of law relative to limitations of actions does not override the preexisting provisions of the uniform arbitration act, G. L. c. 251, §§ 11 and 12, limiting the time within which a party may make an application to vacate an arbitrator's award. [408-410]

A party seeking to vacate an arbitrator's award on the ground that the arbitrator had failed, improperly, to disclose connections with attorneys for the other party was governed by the time limitation applicable to the second clause of G. L. c. 251, § 12(a), respecting "partiality," "corruption," or "misconduct" on the part of the arbitrator, and not by that applicable to the first clause, dealing with awards "procured by corruption, fraud or other undue means." [410-412]

Associations between a neutral arbitrator and the attorneys for one of the parties to an arbitration proceeding, which the arbitrator failed to disclose, were so insubstantial that any challenge to the award on this basis must fail. [412-415]

No adequate basis appeared for disturbing a trial judge's denial of a party's motion for attorney's fees, costs, expenses, and interest under G. L. c. 231, § 6F. [415-416]

CIVIL ACTION commenced in the Superior Court Department on July 17, 1981.

The case was heard by *Forte,* J., a District Court judge sitting under statutory authority.

A proceeding for counsel fees, costs, expenses, and interest was heard in the Appeals Court by *Armstrong, J.*

*Edward T. Dangel, III (Michael K. Mattchen & Charles W. Rankin, Jr.,* with him) for the defendant.

*Edward P. Leibensperger* for the plaintiff.

KAPLAN, J. The defendant Gramercy Mills, Inc. (Gramercy), appeals from a judgment of the Superior Court confirming an arbitration award in favor of the plaintiff Harold Bernstein, and thereby dismissing the defendant's purported counterclaim which sought to vacate the award.

*Statement.* Bernstein acted as Boston-based sales representative of Gramercy, a New Jersey corporation, under a long-term contract entitling Bernstein to commissions for sales of Gramercy products to designated customers. About September, 1979, Bernstein claimed commissions of some $200,000. Gramercy refused to pay. By the terms of the contract, disputes thereunder were to be submitted to arbitration under the rules of the American Arbitration Association (A.A.A.). Bernstein commenced arbitration proceedings in January, 1980. Mr. Paul G. Roberts, a Boston attorney, serving as sole arbitrator, heard the parties on dates between April 28 and August 21, 1980, and on June 3, 1981, made an award of $104,766.68 in favor of Bernstein, served on the parties on June 8, 1981. (A clarification of the award was dated June 29, 1981.)

As Gramercy did not comply with the award, Bernstein on July 17, 1981, commenced an action in the Superior Court under our uniform arbitration act to confirm and enforce it (G. L. c. 251, § 11). Gramercy filed its answer on August 6, 1981. This set forth a counterclaim praying vacation of the award on the ground that Mr. Roberts had failed, improperly, to disclose his connections with the attorneys for Bernstein; a rule of the A.A.A. was cited (see the text at "Merits" below). According to the allegations of the counterclaim, knowledge of these connections had first come to Gramercy's attention on July 15, 1981. Bernstein's reply put in issue the substance of the counterclaim, and also alleged that Gramercy's attempt to vacate the award came

too late, since more than thirty days had elapsed between the effective date of the award, June 8, 1981, and the date of the answer. See G. L. c. 251, § 12(b). After pretrial maneuvers and a nonjury trial, the judge, pretermitting without discussion the question of timeliness, found for Bernstein on the substance, and on February 11, 1982, entered the judgment confirming the award.

Upon consideration, we think Gramercy's effort to vacate the award was time-barred. Were it not so, we would agree with the judge that Gramercy failed on the merits. (We leave to the end a cross appeal by Bernstein from the denial of his application for attorney's fees.)

*Evidence.* The A.A.A. offered to the parties a list of fifteen names from which they might select the arbitrator. Bernstein through his counsel Mr. Irving J. Helman of the Boston firm of Nutter, McClennen & Fish chose seven as acceptable, Mr. Roberts being the first of these in order of preference. Gramercy did not indicate on the record just how it responded to the list, but, to account for the selection of Mr. Roberts in accordance with A.A.A. practice, we may assume that Gramercy either agreed (expressly or by default) with Bernstein's first choice of Mr. Roberts, or put Mr. Roberts in such a place among its own approved names that he turned out the name with proper joint approval.[1] The notice of appointment as arbitrator, mentioning the names of the parties and their counsel (Mr. Helman for Bernstein and Mr. Brett J. Meyer of the New York firm of Ruben Schwartz, Meyer & Schnall for Gramercy), carried a reminder of a duty of disclosure conforming to the A.A.A. rule; Mr. Roberts accepted appointment without more. Mr. Helman did not appear for Bernstein in the arbitration proceeding proper; Mr. Edward P. Leibensperger of the Nutter firm did so. Mr. Meyer appeared for Gramercy.

The award, as noted, came down on June 8, 1981. The record does not disclose just what Gramercy learned on

---

[1] Evidently Mr. Roberts received no information about how he was ranked by either side on the list that had been proffered by the A.A.A.

July 15, 1981, because, according to Gramercy, it consisted of a communication to Gramercy's president that was protected by an attorney-client privilege.

Discovery began as the pleadings in the action were closed, Gramercy being now represented by the Boston law firm which appears for it on the present appeal. The upshot of the pretrial activity was an arrangement under which information was supplied regarding the contacts of lawyers in the Nutter firm with lawyers in the Boston firm of Lappin, Rosen, Goldberg, Slavet, Levenson & Wekstein, with which Mr. Roberts was associated during the period of the arbitration. These are large firms with active practices; the record indicates that there were 88 lawyers in the Nutter firm. Over the five-year period commencing in 1975, there were nine instances of legal matters in which lawyers of the two firms were mutually involved (Mr. Helman is mentioned in one matter and Mr. Leibensperger in another); and six lawyers at the Nutter firm had social contacts with six lawyers at Lappin, Rosen. Mr. Roberts did not figure in any of these relationships.

Also of record at the trial was the fact that Mr. Roberts had two contacts or associations with Mr. Helman. About 1977, when Mr. Roberts began to practice law in Boston, he encountered Mr. Helman in the latter's capacity as chairman of the corporate law section of the Boston Bar Association. And in a six-month period in 1978, Mr. Roberts, then associated with the Boston firm of Guterman, Horvitz, Rubin & Rudman, served as counsel to a client of Mr. Stanley Rudman in transactions concerning a World Jai Alai corporation. The client had been a member of the board of directors and secretary of the corporation. Mr. Helman represented the corporation. Apparently the interests of these parties, which are not depicted in any detail in the record, were divergent. Mr. Roberts met and talked on the telephone with Mr. Helman, but no detail appears.

*Time bar.* Section 12 of the Uniform Arbitration Act, inserted into the General Laws as G. L. c. 251, § 12 (as

amended by St. 1972, c. 200), reproduced in the margin,[2] sets out, in subsection (a), five grounds for applications to vacate awards. The first, § 12(a)(1), is that "the award was procured by corruption, fraud or other undue means." Under subsection (b), an application "predicated upon corruption, fraud, or other undue means" (apparently referring to § 12[a][1])[3] is to be made "within thirty days after such grounds are known or should have been known"; applications otherwise predicated "shall be made within thirty days after delivery of a copy of the award to the applicant."[4]

(1) Gramercy first accepts, arguendo, that the present case involves the second statutory ground for vacating an award — "there was evident partiality by an arbitrator appointed as a neutral, or corruption in any of the arbitrators,

---

[2] "§ 12. (a) Upon application of a party, the court shall vacate an award if: (1) the award was procured by corruption, fraud or other undue means; (2) there was evident partiality by an arbitrator appointed as a neutral, or corruption in any of the arbitrators, or misconduct prejudicing the rights of any party; (3) the arbitrators exceeded their powers; (4) the arbitrators refused to postpone the hearing upon sufficient cause being shown therefor or refused to hear evidence material to the controversy or otherwise so conducted the hearing, contrary to the provisions of section five, as to prejudice substantially the rights of a party; or (5) there was no arbitration agreement and the issue was not adversely determined in proceedings under section two and the party did not participate in the arbitration hearing without raising the objection; but the fact that the relief was such that it could not or would not be granted by a court of law or equity is not ground for vacating or refusing to confirm the award.

"(b) An application under this section shall be made within thirty days after delivery of a copy of the award to the applicant, but, if such application is predicated upon corruption, fraud, or other undue means, it shall be made within thirty days after such grounds are known or should have been known."

[3] The parties do not suggest any other interpretation. See note 6, infra.

[4] There are expressions in a few cases that objections to the "jurisdiction" of arbitrators are not thus limited as to time. In labor arbitration under G. L. c. 150C, it was intimated that "jurisdiction" in this sense might be lacking where there was no arbitration agreement that applied. See Sheahan v. School Comm. of Worcester, 359 Mass. 702, 709-711 (1971), and on particular facts such a ruling was made in Painters Local No. 257 v. Johnson Industrial Painting Contractors, ante 67, 72 (1983). The problem is not encountered in the present case.

or misconduct prejudicing the rights of any party." Thus the thirty-day limit appears to attach. Gramercy contends, however, that the limit is avoided because it did not make an application to vacate the award but rather attacked it by means of a counterclaim in the action to confirm the award.

We think the argument is answered by § 11 of c. 251, inserted by St. 1960, c. 374, § 1, which states: "Upon application of a party, the court shall confirm an award, unless *within the time limits hereinafter imposed* grounds are urged for vacating or modifying or correcting the award, in which case the court shall proceed as provided in sections twelve [vacation of awards] and thirteen [correction or modification]" (emphasis supplied). Under this language, it is plain enough that commencement of an action to confirm an award does not postpone or extend the time for making an application to vacate the award. See *Trustees of the Boston & Me. Corp.* v. *Massachusetts Bay Transportation Authority*, 363 Mass. 386, 394-395 (1973). Cf. *Holmsten Refrigeration, Inc.* v. *Refrigerated Storage Center, Inc.*, 357 Mass. 580, 584 (1970). Gramercy appears to be saying that because it made its attack on the award not, nominally, as an application to vacate it, but, nominally, as a counterclaim in the action previously brought to confirm the award, it may escape the thirty-day bar. This would be a perverse surrender to the merest form, and we believe § 11 is adequate to cover the latter situation as it does the former. This conforms to the view of the chairman of the committee of the National Conference of Commissioners on Uniform State Laws which drafted the uniform act. Pirsig, Some Comments on Arbitration Legislation and the Uniform Act, 10 Vand.L.Rev. 685, 707 (1957).

Gramercy next points to G. L. c. 260, § 36, inserted by St. 1973, c. 1114, § 341, a statute regarding so called compulsory counterclaims, which states in part that "a counterclaim arising out of the same transaction or occurrence that is the subject matter of the plaintiff's claim, to the extent of the plaintiff's claim, may be asserted without regard to the provisions of law relative to limitations of actions." Al-

though enacted after the uniform act, G. L. c. 260, § 36 does not override §§ 11 and 12 of that act. On inspection, § 36 seems to be addressed to limitations periods measured from the breach of primary duties, and could apply to the present case only by a distortion of its intent. Further, as a § 36 counterclaim can go only "to the extent of the plaintiff's claim," it corresponds to "recoupment" in the pre-Rules practice. See *Bose Corp.* v. *Consumers Union of United States, Inc.*, 367 Mass. 424, 427-431 (1975); Smith & Zobel, Rules Practice § 13.31 (1974). The present "counterclaim," however, bears no resemblance to a recoupment. See on this point *Chauffeurs, Teamsters, Warehousemen & Helpers Local No. 135* v. *Jefferson Trucking Co.*, 628 F.2d 1023, 1027 (7th Cir. 1980), cert. denied, 449 U.S. 1125 (1981). See also *Nalley* v. *McClements*, 295 F. Supp. 1357 (D.Del. 1969). If § 36 could be otherwise interpreted, it would threaten a conflict with the uniform act, and since the former is a general enactment while the latter is focused specifically on the arbitral process, a common rule of statutory construction would except the provisions of the uniform act from the sweep of the general statute and preserve them. See 2A Sands, Sutherland Statutory Construction § 51.05 (4th ed. 1973). See also *Pereira* v. *New England LNG Co.*, 364 Mass. 109, 118-119 (1973).

The question reaches deeper. The arbitration statute aims to flush out objections to awards with dispatch, and it should not prejudice that purpose that the winner of an award has been obliged to bring an action to confirm and enforce it, nor should it matter what tricks of nomenclature may be used to characterize the objection. The Seventh Circuit Court of Appeals, repelling such an effort as Gramercy's, said in *Chauffeurs, Teamsters, Warehousemen & Helpers Local No. 135* v. *Jefferson Trucking Co., supra* at 1027: "[T]he purpose of the short periods prescribed in the federal and state arbitration statutes for moving courts to vacate an award is to accord the arbitration award finality in a timely fashion. As the district court observed, this policy would seem to condemn the conduct of the defendant

who ignored an award disfavorable to it, failed to move to vacate the award, and then sought to be given its day in court when the plaintiff brought suit in frustration to have the arbitration award enforced. If the defendant's defenses were of such vital importance to it, the defendant nevertheless had an opportunity to raise them in the manner contemplated by statute." The *Chauffeurs* statement is the stronger for the fact that it dealt with the United States Arbitration Act (9 U.S.C. §§ 9-12 [1976]) which has no provision on the style of our § 11. The courts, whether under that legislation or the uniform act, have held, apparently prevailingly, that the time limits applied where the grounds for vacation were set up in the way of response to actions to confirm awards. *Service Employees Intl. Union* v. *Office Center Servs., Inc.,* 670 F.2d 404, 412 (3d Cir. 1982). *Kress Corp.* v. *Edward C. Levy Co.,* 102 Ill. App. 3d 264, 266-269 (1981). *Component Syss.* v. *Murray,* 300 Minn. 21, 25 (1974). Our own courts, indeed, appear — although without much discussion — to have taken the same position in respect to analogous provisions of the labor arbitration statute, G. L. c. 150C, § 11. See *Greene* v. *Mari & Sons Flooring,* 362 Mass. 560, 562 (1972); *Painters Dist. Council No. 35* v. *J.A.L. Painting, Inc.,* 11 Mass. App. Ct. 698, 701 (1981); *DeLorto* v. *United Parcel Serv., Inc.,* 401 F. Supp. 408, 409 (D.Mass. 1975).[5]

(2) Gramercy argues, alternatively, that the ground of vacation involved here was not really the second listed in § 12(a) about "partiality" and so forth, but the first, that "the award was procured by corruption, fraud or other undue means." If we accept that it not only did not know, but should not have known before July 15, 1981, of the sup-

---

[5] An aberrant view which allowed late assertion of grounds for vacation as defenses to actions to confirm (see *Riko Enterprises, Inc.* v. *Seattle Supersonics Corp.,* 357 F. Supp. 521, 523 [S.D. N.Y. 1973]; cf. *Arrow Overall Supply Co.* v. *Peloquin Enterprises,* 414 Mich. 95, 101 [1982]), has been repudiated in *Chauffeurs, Teamsters, Warehousemen & Helpers Local No. 135* v. *Jefferson Trucking Co., supra* at 1026; *Service Employees Intl. Union* v. *Office Center Servs., Inc., supra* at 410-411; *Kress Corp.* v. *Edward C. Levy, supra* at 266-267.

posed nondisclosure by Mr. Roberts, Gramercy still faces the problem that the case does not fit the first clause. Professor Pirsig tells us that, as a general proposition, the first clause of the uniform act speaks to misbehavior of the parties or third persons, the second to arbitrators' misbehavior; and this is a quite natural reading. See Pirsig, *supra* at 704.[6]

Further, Gramercy on this appeal makes no claim that by reason of the arbitrator's nondisclosure there was a procurement of an award by "corruption" and so forth in the ordinary sense of the words. Rather the suggestion is that the clause should be read by the introduction of an analogy. The reference is to the tort of so called innocent or constructive fraud consisting of damaging reliance by a party on an erroneous, though not purposeful, representation of fact by another who, with reasonable effort, might have obtained and communicated precise and accurate information. See *National Academy of Sciences* v. *Cambridge Trust Co.*, 370 Mass. 303, 308 (1976); Restatement (Second) of Torts § 552 (1976). An omission by a fiduciary might be equated with an active misrepresentation. See *Energy Resources Corp.* v. *Porter*, 14 Mass. App. Ct. 296, 304 (1982) (Brown, J., concurring); *Gannett* v. *Lowell, ante* 325, 329 (1983). At all events, the idea of inflating the first clause by means of the analogy appears farfetched; the first clause would then be well on its way to swallowing up the second. We have not, however, to decide whether, by some process of attenuation of the language of the first clause, the present case could be brought within it. Such a process might be permissible if there were no other clause in the statute to which the present case could more plainly claim admittance. But there is such a clause, the second: where there is a toxic

---

[6] On this general reading, the first clause plausibly calls for a more generous time provision than the other clauses.

We do not exclude the possibility that, as exceptions to Professor Pirsig's general proposition, some cases of arbitrators' nondisclosure may fit the first clause of subsection (*a*) or the similar language contained in subsection (*b*), but those, we think, would have to be far removed on their facts from anything that was or could be claimed here.

relationship between an arbitrator and a party or counsel, the failure to disclose is evidence of the "partiality" mentioned in that clause. In cases of nondisclosure, the second clause is in fact regularly invoked.[7]

*Merits.* Rule 18 of A.A.A.'s Commercial Arbitration Rules (numbered 19 after April 1, 1981) states: "A person appointed as neutral Arbitrator shall disclose to the A.A.A. any circumstances likely to affect his impartiality, including any bias or any financial or personal interest in the result of the arbitration or any past or present relationship with the parties or their counsel."[8] The trial judge found on the evidence that Mr. Roberts "knew of no circumstances likely to affect his impartiality," and, further (evidently on an objective view), that his associations with Mr. Helman or any others were not such as to require disclosure under rule 18. Thus there was insufficient basis for vacating the award on the "partiality" ground of § 12(*a*)(2) (any claim under § 12[*a*][1] was wholly meritless).[9]

---

[7] See, e.g., *Middlesex Mut. Ins. Co.* v. *Levine,* 675 F.2d 1197, 1200-1202 (11th Cir. 1982); *Cook Indus., Inc.* v. *Itoh & Co.,* 449 F.2d 106, 107 (2d Cir. 1971); *Barcon Associates* v. *Tri-County Asphalt,* 86 N.J. 179, 182 (1981); *Richco Structures* v. *Parkside Village, Inc.,* 82 Wis. 2d 547, 556-558 (1978). In *Commonwealth Coatings Corp.* v. *Continental Cas. Co.,* 393 U.S. 145, 147 (1968), a nondisclosure case under the United States Arbitration Act which resulted in the overthrow of the award, Justice Black's opinion for the Court refers both to the "undue means" part of the first clause of 9 U.S.C. § 10 (1964) (similar to our § 12[*a*][1]) and the "partiality" part of the second clause of § 10. However, no question of differential time limits was involved, as there is a flat ninety-day provision as to both clauses in the United States act. Also the second clause of that act is less compendious than our § 12(*a*)(2), as it does not have the windup phrase "or misconduct prejudicing the rights of any party." The dissenting opinion in *Commonwealth Coatings (id.* at 154) focuses on the "partiality" language.

[8] Rule 18 goes on to state: "Upon receipt of said information from such Arbitrator or other source, the A.A.A. shall communicate such information to the parties, and, if it deems it appropriate to do so, to the Arbitrator and others. Thereafter, the A.A.A. shall determine whether the Arbitrator should be disqualified and shall inform the parties of its decision, which shall be conclusive."

[9] For purposes of the present case we need not inquire whether some violations of the standard of rule 18 would still not merit vacation of

The findings are unimpeachable and we agree that the associations that went undisclosed were so thin that any challenge to the award must fail. The case is not unlike our recent *Wilson* v. *Dan McCabe's Creative Carpentry, Inc.*, 11 Mass. App. Ct. 956 (1981), where "partiality" was vainly claimed on the basis that the arbitrator and the president of a corporate party had both been active in town affairs. Similarly denying vacation for arbitrator's nondisclosure were *San Luis Obispo Bay Properties* v. *Pacific Gas & Elec. Co.*, 28 Cal.App. 3d 556, 567-570 (1972) (membership in same professional organization as a party's appraiser; occasional mutual reference of business); *Cross Properties, Inc.* v. *Gimbel Bros.*, 15 A.D. 2d 913, 914 (per curiam), aff'd mem., 12 N.Y. 2d 806 (1962) (isolated real estate transactions with a party); *R.E. Bean Constr. Co.* v. *Middlebury Associates*, 139 Vt. 200, 207-208 (1980) (personal and professional relationships with several attorneys for a party); *St. Paul Ins. Cos.* v. *Lusis*, 6 Wash. App. 205, 214-215 (1971) (membership with counsel for a party on the board of governors of a State trial lawyers association).

Contrast the facts of cases in which courts have found illicit "partiality" of arbitrators because of nondisclosure: *Commonwealth Coatings Corp.* v. *Continental Cas. Co.*, 393 U.S. 145, 149 (1968) (receipt of consulting fees from a party over a period of more than four years); *Johnston* v. *Security Ins. Co.*, 6 Cal. App. 3d 839, 843 (1970) (past and present business dealings with a party's appraiser); *Northwest Mechanical, Inc.* v. *Public Util. Commn.*, 283 N.W. 2d 522, 523 (Minn. 1979) (substantial business through affiliated corporations with a party; repeated legal representation of a party); *Barcon Associates* v. *Tri-County Asphalt Corp.*, 86 N.J. 179, 192 (1981) (long business relations with a party then indebted to arbitrator); *J.P. Stevens & Co.* v. *Rytex Corp.*, 34 N.Y. 2d 123, 129-130 (1974) (large annual business of employer of two arbitrators with one of the

---

awards under the statute. Consider on this question *Merit Ins. Co.* v. *Leatherby Ins. Co.*, 714 F.2d 673 (7th Cir. 1983).

parties); *Richco Structures* v. *Parkside Village, Inc.*, 82 Wis. 2d 547, 558 (1978) (twenty years' business relations with a party).

We add a general remark. A.A.A.'s rule 18 helps to describe a level of nondisclosure that can lead to invalidation of an award under the statute. (See n.9.) But for the day-to-day workings of the arbitral process, a guide to arbitrators and parties is provided to some extent by a "Code of Ethics for Arbitrators in Commercial Disputes" prepared in 1977 by a joint committee of the A.A.A. and the American Bar Association.[10]  Canon II — "An arbitrator should disclose any interest or relationship likely to affect impartiality or which might create an appearance of partiality or bias" — is particularized in a passage reproduced in the margin.[11]  It will be observed that "appearances" are mentioned as well as the realities; not only direct but indirect interests are to be considered; "relationships" of family members, employers, and business associates may require attention; and arbitrators are under obligation to inform themselves of associations that may need to be disclosed. A note appended to the canon[12] indicates its intended direc-

---

[10] A copy was admitted at trial as an exhibit.

[11] "*Disclosure*:  A.  Persons who are requested to serve as arbitrators should, before accepting, disclose: (1) Any direct or indirect financial or personal interest in the outcome of the arbitration; (2) Any existing or past financial, business, professional, family or social relationships which are likely to affect impartiality or which might reasonably create an appearance of partiality or bias. Persons requested to serve as arbitrators should disclose any such relationships which they personally have with any party or its lawyer, or with any individual whom they have been told will be a witness. They should also disclose any such relationships involving members of their families or their current employers, partners or business associates.

"B.  Persons who are requested to accept appointment as arbitrators should make a reasonable effort to inform themselves of any interests or relationships described in Paragraph A above."

[12] "In applying the provisions of this Code, relating to disclosure, it may be helpful to recall the words of the concurring opinion in a case decided by the United States Supreme Court, that arbitrators 'should err on the side of disclosure' because 'it is better that the relationship be disclosed

tion — doubts about a need to disclose should be resolved in favor of disclosure; but arbitrators are not bound to go to the paranoid extreme of disclosing trivial associations.

Had the arbitrator here had the Code in mind, he would likely have been led to mention his acquaintance with Mr. Helman and to make simple inquiries among his associates, empty as the results would be. Although there was no serious relationship in the sense of the canon, the disclosure could have avoided trouble, expense, and the present lawsuit.

We observe, finally, that the present decision should not encourage any arbitrator to withhold a statement of relationships that should in decency be disclosed, upon the supposition that a court would be reluctant to vacate a completed award if the facts should finally come to light. Cf. *R.E. Bean Constr. Co.* v. *Middlebury Associates, supra* at 208.

*Cross appeal.* Bernstein sought reimbursement of his attorney's fees, and costs, expenses, and interest under G. L. c. 231, § 6F, on the ground that Gramercy's position in the action was insubstantial, frivolous, and not advanced in good faith. The trial judge denied the motion, and a single justice of this court affirmed the denial. On the present review, we are adjured to infer from the record that Gramercy concocted a grievance about nondisclosure as a means of staving off (or, if the court should prove suscep-

---

at the outset when the parties are free to reject the arbitrator or accept him with knowledge of the relationship.' At the same time it must be recognized that 'an arbitrator's business relationships may be diverse indeed, involving more or less remote commercial connections with great numbers of people.' Accordingly, an arbitrator 'cannot be expected to provide the parties with his complete and unexpurgated business biography,' nor is an arbitrator called upon to disclose interests or relationships which are merely 'trivial.' (Concurring opinion in *Commonwealth Coatings Corp.* v. *Continental Cas. Co.*, 393 U.S. 145, 151-152 [1968].)"

tible, avoiding altogether) a sizable liability.[13]  However, we do not find an adequate basis for reversing the determinations previously made.

*Judgment affirmed.*

*Order of the single justice affirmed.*

---

[13] As Bernstein points out, a staving off might itself be advantageous to the judgment debtor because, under the law prevailing in this Commonwealth (but not, for example, in Federal courts), an appeal from a money judgment usually has the effect, in itself, of staying its enforcement, and the debtor may, through investment of the amount involved, take the benefit of a difference between the market rate of return and the legal rate of interest until the time the judgment is finally paid.  Some, but not much, control can be exercised through G. L. c. 231, § 6F, and by G. L. c. 211A, § 15 (frivolous appeals; costs and interest), and Mass.R.A.P. 25, as amended, 378 Mass. 925 (1979) (damages for delay).  Whether this system tends to cause a glut of insubstantial appeals, or is generally fair, has been and may well be debated.