No. 83,572

CITY OF COFFEYVILLE, KANSAS, *Appellee*, v. INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, LOCAL NO. 1523, *et al., Appellants.*

(14 P.3d 1)

Opinion filed December 8, 2000.

*Elizabeth Lea Henry*, of Fletcher & Mathewson, P.A., of Wichita, argued the cause and was on the brief for appellant International Brotherhood of Electrical Workers, Local No. 1523.

*David E. Strecker*, of Strecker & Associates, P.C., of Tulsa, Oklahoma, argued the cause, and *James E. Erwin*, of the same firm, and *Paul M. Kritz*, city attorney, of Coffeyville, were with him on the brief for appellee.

The opinion of the court was delivered by

ABBOTT, J. This appeal arises out of the private arbitration undertaken by the parties regarding the discharge of an employee of the City of Coffeyville (City). The employee, Harry Thomas, was protected by the provisions of the collective bargaining agreement previously negotiated between the International Brotherhood of Electrical Workers, Local 1523 (IBEW) and the City pursuant to K.S.A. 75-4321. Under this contract, the issue of whether the City had "just cause" to terminate the employment of Thomas was submitted to arbitration before a private arbitrator selected by the parties through the auspices of the Federal Mediation and Conciliation Services. The arbitrator elicited testimony over several days from both parties as well as legal arguments in the form of briefs and rendered a decision in favor of the grievant and his union. The arbitrator ordered the City to reinstate Thomas with back pay pursuant to the terms of the parties' contract.

The district court reviewed the contract between the parties, the decision of the arbitrator, and the legal arguments of the parties, and then issued an order vacating the arbitrator's decision and ordering that the case be remanded to a new arbitrator selected by the parties pursuant to their contract. The district court held that the arbitrator had exceeded his authority in rendering his decision by applying an improper standard to the discharge issue. The Union appeals.

We start with the controlling facts as found by the arbitrator. The City operates a municipal electric utility. It serves the City, an industrial park, and some surrounding areas. Local No. 1523 of the International Brotherhood of Electrical Workers (IBEW) represents most of the employees for the utility. The parties bargain under the Kansas Public Employer-Employee Relations Act (PEERA), K.S.A. 75-4321 *et seq.*

The grievant, Thomas, is a Trouble Truck Foreman. In that capacity he responds to power outages and either repairs them or

requests additional assistance. He is a journeyman lineman with over 19 years of experience.

On the night of May 26, 1997, Thomas was called because the city experienced a thunderstorm and several areas were without power. During the evening, Thomas went to Substation A to do a visual inspection and work on restoring power. When he got there, foreman Larry Quigley was there and the two began to work. Thomas believed he smelled alcohol on Quigley's breath and reported it to the city manager, who had just arrived at Substation A. The city manager testified he was suffering from allergies and was unable to determine if Quigley smelled of alcohol. After most of the work was done, Quigley got into his city-owned vehicle and drove toward town. Thomas called 911 and reported what he believed was a drunk driver. The police found Quigley's vehicle in front of his home. No one was in the car, and the police made no contact with Quigley.

The next day Thomas found a business card of the Coffeyville Insurance Associates (CI) in his utility vehicle and called them. Vicki Stonecipher answered the phone because the regular receptionist was at lunch. Stonecipher is a "producer" and has nothing to do with the account between the City and Employees Mutual Insurance Companys (EMC) agent CI. Thomas posed a hypothetical question of what could happen to the Citys insurance if it allowed employees who are under the influence of alcohol to drive city-owned vehicles. Stonecipher said she did not answer hypothetical questions.

Thomas subsequently explained that Quigley was arrested for drunk driving 16 or 17 years ago and he had flunked "drunk school." He did not mention the previous night's incident or the history of problems Quigley allegedly had with alcohol. At no point did he identify himself as a union steward or state he was investigating a grievance. At the end of his conversation he did give his name.

There is some dispute as to whether Thomas requested the information to be passed along to the agent in charge of the city account. The City claims he did and the Union claims he did not. What is not in dispute is when an assistant to the agent returned

to the office, Stonecipher passed the information along and the assistant requested the motor vehicle report on Quigley. The report showed no violations. The assistant called the underwriter for the insurance company and the city manager to express concern that individual employees would contact their office.

On June 2, 1997, Thomas filed a grievance with the City citing a safety violation of having Quigley work on an electrical substation while drunk. The IBEW dropped the grievance after the second step.

The City suspended Thomas with pay while it investigated Thomas' phone call to CI. A grievance was filed on June 13, 1997, and a Prohibited Practice Complaint (PPC) was filed with the Kansas Employment Relations Board on June 19, 1997. After learning the substance of the conversation with Stonecipher and believing that the call could bring potential damage to the City, including losing its policy with EMC, the City held an administrative hearing on June 25, 1997. The City and the IBEW agreed the hearing constituted a third step to the grievance procedure. At the hearing, the City determined that Thomas made the phone call, not as a part of the safety committee or to investigate a grievance, but in an attempt to discredit the City. They decided that amounted to insubordination and was just cause to terminate Thomas and did so at the conclusion of the meeting. Because Thomas was a long-standing employee, they offered him a demotion, a 2-week suspension without pay, 1 year of probation, required him to write a letter to CI explaining his motives, and required him to sign a release. Thomas refused the Citys offer and was terminated; the grievance proceeded to arbitration. The PPC was held in abeyance or "Collyerized" in an order issued on September 2, 1997. See *Collyer Insulated Wire*, 192 N.L.R.B. 837 (1971).

In addition to these facts, the testimony before the arbitrator revealed that the telephone call made by Thomas to Stonecipher was the sole reason for the decision to terminate his employment. He had received satisfactory evaluations and had no significant history of previous discipline. There was also testimony from Thomas that he had been appointed as a union steward and a member of the safety committee in December 31, 1996, about 5 months be-

fore his termination. Thomas testified that he called Stonecipher in an effort to investigate in preparation for filing a safety grievance in his capacity as a steward protesting Quigleys performance of work while smelling of alcohol. Thomas testified that he was aware of prior incidents when employees believed Quigley was exhibiting the effects of alcohol use while working. Thomas and a coworker, Ray Robinson, testified that they had talked with the city manager about a month earlier about their concerns regarding Quigley and alcohol use. He had also sought the advice of the IBEW business agent regarding the measures which could be taken the next time Quigley showed up for work under the influence of alcohol.

There was also extensive testimony from current and former employees of the City regarding a history of employee concerns about the work safety and the drinking habits of Quigley. Although much of this testimony concerned incidents remote in time to Thomas discharge, each of these witnesses testified that during their tenure Quigley appeared for work evidencing the use of alcohol as often as one to three times per week. Among the incidents recounted in which the witness recalled that Quigley was intoxicated or smelled of alcohol was one which prompted the filing of a grievance in 1987. A journeyman lineman described the condition in which Quigley reported to a substation to attend to an after-hours power outage as follows: "Now, at that time Larry was so drunk he couldn't hardly stand up. Now, I didn't need a breathalyzer that night. He was slurring on the phone. He was stumbling around in there."

The journeyman further testified that Quigley became confused regarding the significance of various indicator lights and kept insisting the power was on when it was off. The employee was so concerned that Quigley might fall against or throw a breaker while he was working to resolve the cause of the problem that he insisted Quigley go outside and stand next to him while he worked.

Another journeyman testified that in 1992, on a day when Quigley smelled strongly of alcohol, he instructed a crew on which the journeyman was working to install a new pole. Quigley had not obtained the necessary "locate" on the underground utilities in the area and the crew hit a water line, spraying water everywhere and

completely draining the local water tower. The same witness testified that on another occasion when Quigley smelled of alcohol, he ordered a crew to dig a trench without a locate on the utilities resulting in the rupture of a gas line.

Finally, a current employee of the City testified that in approximately 1996, he called Quigley about a power outage at a substation referred to as A Sub. The witness believed that Quigley was intoxicated because he seemed incoherent and kept asking "where's A Sub." Because there are only five substations in the City, the witness concluded Quigley was intoxicated and not in a condition to respond to the emergency.

The following provisions of the memorandum of understanding between the City and the IBEW control the issue of whether the discharge of Thomas violated the collective bargaining agreement or was for just cause:

"VII. EMPLOYEE CONDUCT

"A. DISCIPLINARY ACTION

"Employees are expected to conduct themselves at all times so as to reflect credit on themselves and the City. Any action which reflects discredit upon the City or is a direct hindrance to the effective operation of public facilities shall be considered good cause for disciplinary action. The following are examples of unacceptable conduct, the performance of which by an employee shall result in the employees being subject to official reprimand, suspension or dismissal.

1. Insubordinate conduct.
2. Failure to follow orders.
3. Consumption of alcoholic beverages or unauthorized drugs while on duty.
4. Reporting to work while under the influence of alcohol or drugs.
5. Theft or willful destruction of property or services.
6. Sleeping during duty hours (except Fire Department).
7. Unauthorized absence during working hours (includes extended break periods).
8. Deliberate falsification of employment records or other reports.
9. Acts or conduct disruptive to the orderly conduct of city business.
10. The use of offensive language or discourteous action or behavior while on duty.
11. Conviction of any felony charge.
12. Wantonly and willfully endangering life and property.
13. Abuse of leave.
14. Gross misappropriation of funds or property.
15. Neglect of duty.

16. Tardiness in reporting to work.
17. Failure to satisfactorily perform job duties.
"Charges may be based upon causes and complaints other than those listed.

## "B.  OFFICIAL REPRIMAND

"When a supervisor finds it necessary to correct an employee for acts of misconduct or errors in judgment he/she shall utilize the following steps.

### 1.  VERBAL WARNING

Verbally warns the employee stating the misconduct or error and expected action by the employee.

### 2.  WRITTEN REPRIMAND

When a supervisor finds it necessary to correct an employee subsequent to a verbal warning for another act of misconduct or serious error, he/she shall do so by officially reprimanding the employee in writing by issuing the Employee Warning Form. Such reprimand shall detail the offense(s) committed, the circumstances thereof, and the corrective action(s) to be taken within a specified time period. Official reprimands are to made part of the employees permanent personnel record. Reprimands shall not be used for disciplinary action after two years.

### 3.  DISCIPLINARY PROBATION

When a department director or his/her designee determines that a regular full-time employee has committed another act of misconduct or serious error in judgment subsequent to a written reprimand, he/she may, at his/her discretion, place the offending employee on disciplinary probation for a period of up to ninety (90) days. Notice of such probation is to be given to the employee in writing using the Employee Warning Form. The disciplinary probationary period is intended to allow a supervisor an extended period in which to re-evaluate the offending employees proficiency and performance.

Should there be a reoccurrence of offenses or misjudgments, the employee is subject to dismissal, subject to the grievance procedure.

The Personnel Department shall make such record entries in the employees personnel file as necessary to document this procedure.

### 4.  SUSPENSION

When a department director finds it necessary to suspend an employee from duty with or without pay for disciplinary reasons, he[/she] has the authority to place the offending employee on suspension from one (1) day to an indefinite period (pending further action or dismissal) . Such suspension shall be supported by written documentation as described in Section 2 and 3 above. All suspensions shall be reviewed by the City Manager.

An employee placed on suspension shall not be present at the work site without written permission from the department director.

If the action is reversed, the suspended employee shall receive back pay for all time on suspension. If the action is upheld, the suspension stands. The decision

of the City Manager is final, subject to the grievance procedure. If the action is modified, appropriate adjustments to back pay shall be made.

### 5. DEMOTION
When a department director finds it necessary to demote an employee for just cause, it shall be supported with written documentation and approved by the City Manager, subject to the grievance procedure.

### 6. DISMISSAL
Any employee may be dismissed with cause. All dismissals are subject to the discretionary review of the City Manager. All appointed officials of the City, as defined elsewhere herein, serve at the pleasure of the City Manager and are subject to removal at any time in accordance with procedures outlined by City Ordinance and State Law.

Upon same day as dismissal, a check shall be issued to the dismissed employee for all hours worked to date and any vacation due.

Employees shall not be discharged without just cause, and if so found that an employee has been unjustly discharged, such employee shall be reinstated with no loss of accrued sick leave and seniority benefits and paid for time lost at his regular rate of pay. Other benefits including medical insurance, life insurance, pension, etc. will be addressed on a case by case basis. If there are any complaints concerning the employees work that may be cause for discharge, the complaint shall be filed with the employee in writing. Appeal from any discharge must be made to the City in writing by the employee within seven (7) calendar days. An employee organization representing the bargaining unit to which the employee belongs may make an appeal to the discharge. The City must then reach a decision within a reasonable number of days from the date of this appeal."

The arbitration process is described in the contract as follows:

### "IX. ARBITRATION PROCEDURE
"C. The arbitrator shall be called upon to interpret the collective bargaining agreement *but the arbitrator shall have no power to change, modify or alter the collective bargaining agreement.*

"D. The decision of the arbitrator shall be final and binding on both parties provided that such decision is in conformity with limitations set forth in this agreement. The cost of arbitration shall be equally by the parties [sic]." (Emphasis added.)

The issue submitted for decision by the arbitrator was stated as follows: "Did the City have just cause to discharge the Grievant for calling Coffeyville Insurance Associates and asking what could happen to the City if an employee was under the influence of alcohol while driving a City vehicle?"

The arbitrator applied a seven-part test used in the arbitration of discharge cases to determine whether there was just cause for Thomas' termination. The arbitrator stated:

"This Arbitrator has a long history of deferring discharge cases to the standards set by Arbitrator Carroll Dougherity in his case *Enterprise Wire [Co.]*, 46 L.A. 359 (1966). In that case Dougherity presents seven questions or standards that an Employer must meet to terminate or discipline an Employee. An answer of no to any question means that the Employer does not have just cause to terminate or discipline the Employee. A short discussion may be found in *Remedies in Arbitration* by Marvin Hill, Jr. and Anthony V. Sinicropi, 1981."

The seven questions which the arbitrator evaluated were: (1) Did the employer give the grievant forewarning or foreknowledge of the possible or probable disciplinary consequences of the grievant's conduct? (2) Was the employer's rule or managerial order reasonably related to the orderly, efficient, and safe operation of the company's business and the performance that the employer might properly expect from the employees? (3) Did the employer, before administering discipline to the grievant, make an effort to discover whether the grievant did in fact violate or disobey a rule or order of management? (4) Was the employer's investigation conducted fairly and objectively? (5) Did the investigator obtain substantial evidence or proof that the grievant was guilty as charged? (6) Has the employer applied its rules, orders, and penalties evenhandedly and without discrimination to all employees? and (7) Was the degree of discipline administered by the employer reasonably related to the seriousness of the grievant's proven offense and the record of the grievant's service to the employer?

In using the seven-part *Enterprise Wire* test, the arbitrator here found that just cause did not exist and that pursuant to the contract provision stated above in article VII, section (B)(6), Thomas was entitled to reinstatement with full back pay and benefits. See *Enterprise Wire Co.*, 46 Lab. Arb. (BNA) 359 (1966) (Dougherity, Arb.).

The City sought to overturn the decision of the arbitrator by filing a petition for review with the Montgomery County District Court. After consideration of much legal argument regarding the jurisdictional basis for review of a private arbitration of an em-

ployment matter, the district court held that it had no authority to entertain such a review under PEERA or the Kansas Act for Judicial Review and Civil Enforcement of Agency Actions, K.S.A. 77-601 *et seq.*, but that it did have jurisdiction to review the arbitrators decision under the common-law standard of review as expressed in *Coleman v. Local No. 570*, 181 Kan. 969, 317 P.2d 831 (1957).

The district court subsequently set aside the decision of the arbitrator and ordered the case to be resubmitted to a different arbitrator. In doing so, the court stated:

"The Agreement does not require that the employee's conduct actually cause harm or disruption. . . . [The arbitrator] concluded that Thomas' actions did not cause actual harm or discredit to the City. Based on these findings, he determined there was no harm or discredit to the City and, therefore, concluded the City did not have just cause to discharge Thomas. [The arbitrator's] decision missed the point. The Agreement provides that employees may also be disciplined, to include discharge, for actions, which are a direct hindrance to the effective operation of public facilities, which are disruptive to the orderly conduct of the City's business, or for insubordination. [The arbitrator] never determined that Thomas' actions were not insubordinate, not a direct hindrance to the effective operation of the City or not disruptive to the orderly conduct of City business.

"13. By finding that the City did not have just cause to discharge Thomas solely because no harm or discredit was in fact caused by his actions, [the arbitrator] effectively modified the City's ability under the Agreement to discipline its employees. Misconduct does not have to result in actual harm or disruption for it to be punished under the Agreement.

"14. In reaching his decision, [the arbitrator] imposed an onerous 7-part test to determine if the City had just cause to discharge Thomas. Unless the City met each and every criterion of this test, good cause would not be found.

"15. As the City pointed out in its Petition for Review, the parties never agreed to the imposition of this test to determine good cause for discipline or discharge. The Agreement simply provides 'any employee may be disciplined with cause.' . . . Under Section VII of the Agreement, paragraph A, entitled 'Disciplinary Action,' there is a list of specific types of unacceptable conduct 'the performance of which by an employee shall result in the employee's being subject to official reprimand, suspension or dismissal.' . . . The City claims it dismissed Thomas because it found he had engaged in unacceptable conduct as listed in the Agreement.

"[The arbitrator's] duty was to determine whether Thomas engaged in actions which constituted unacceptable conduct as outlined in the Agreement. If he found that Thomas did engage in such actions then, according to the Agreement, he may be dismissed. Alternatively, if he found Thomas did not engage in actions

which, under the Agreement, constituted unacceptable behavior, then he must be reinstated. [The arbitrator] failed to make *this* determination. . . .

"By finding the City could only discipline Thomas if it met all the elements of an onerous test it never bargained to be bound by, [the arbitrator] substantially modified the Agreement between the City and the Union, and the parties are not bound by this award."

## Pertinent parts of the arbitrator's award follows:

"*3. Did the Employer, before administering discipline to the Grievant, make an effort to discover whether the Grievant did in fact violate or disobey a rule or order of management?*

"Before disciplining the Grievant the City made a leap of faith from the knowledge that the phone call was made to the possible loss of their insurance coverage. There is no evidence that that phone call could have cost the city their insurance. The City most likely would have been in grave danger of losing their EMC insurance if 'Q' or some other employee had an accident in a city vehicle while either being under the influence of alcohol. In short, this is a clear case of 'killing the messenger' instead of dealing with the real issue of employees driving city cars while under the influence of alcohol. Further, the City could not hide a conviction because all insurance companies review the driving records before they issue a policy. As in this case the insurance company would check all Department of Motor Vehicle records through a few clicks on a computer keyboard. It is convictions, not old rumors, that impact insurance rates and coverage.

"It is true that the City did [lose] its insurance with EMC from 1993 to 1995, but there is nothing in the record that the City was the cause of [losing] the insurance. Insurance companies do not tell why they choose not to renew a policy. It could have been an office screw up that the City had no knowledge of, or it may have been that the Insurance Company wanted to make the City sweat and force them into jumping through hoops before reissuing the policy. No one knows and it is not possible to say. The City has always assumed it was something that it did and there is no proof of that in the record. What is clear is the failure to renew forced the City to pay more money and re- examine its risk potential. When it reduced its risk the contract with EMC was issued.

"The Arbitrator wants to make it clear that the phone call not only did not cause the Employer to run the risk of losing its insurance through EMC. The phone call did not discredit or cause disrepute to the City in any way shape [or] form.

"No, the Employer, before administering discipline to the Grievant, did not make an effort to discover whether the Grievant did in fact violate or disobey a rule or order of management.

"*4. Was the Employer's investigation conducted fairly and objective?*

"The Arbitrator believes that the decision to terminate the Grievant was made before the Administrative Review. Instead of this being a forum where the Grie-

vant could be heard and issues between the Employer and the Union could be exchanged it was a sham forum, which was possibly designed to meet the requirements of the U.S. Supreme Court's Laudermilch decision. At the conclusion of the forum, the Grievant was not only terminated but also given an alternative of two weeks off without pay, a demotion and other requirements. This is not the type of choice that is made on the spur of the moment but would require thinking and planning. The City went through the motions, but the decision has been made long before the Union and Grievant showed up that day.

"The Arbitrator must also examine the question of the termination and the timing of the termination of a Union Steward. The City argues that the call to CI had nothing to do with a grievance because it had not been filed. There is no requirement that a grievance be filed before an investigation takes place. Further the City would put the Steward in the position of requiring him to either tell or at least give prior knowledge whom the Steward would call. This is in clear opposition to years of independence that American Trade Unions are required to represent American workers. The IBEW does not represent the utility, but the workers, and looks out after their interests. Finally, the City is correct that the call was a mistake. Even the Grievant and the Union Counsel would agree with that point, but the Grievant did not know that prior to his making the call. Some investigations drill dry holes and dead ends but one never knows until the investigation is made. The Arbitrator believes that this was the termination of a Union Steward with the intent to stifle the practice of his rights under the Kansas PERA.

"No, the Employer's investigation was not conducted fairly and was not objective.

"*5. At the investigation did the 'judge' obtain substantial evidence or proof that the Grievant was guilty as charged?*

"The Employer has assumed that the phone call made by the Grievant put the City at risk of [losing] its insurance. There is no proof of that claim. Insurance Companies do not make decisions based on rumors of court actions that occurred over fifteen years ago. Rumors do not have an affect on the bottom line like convictions for DWI or other alcohol offenses. Before each contract is issued they check to determine if the Employer has bad risks driving their vehicles. Accidents, speeding violations and certainly DWI arrests will set off bells in any insurance agent's office. In this case they checked 'Q's' record and found it clean. If it had violations then it would be the violations and not the phone calls that caused the problems.

"While the phone call was not smart, it clearly did not bring any discredit to the City.

"No, at the investigation the 'judge' did not obtain substantial evidence or proof that the Grievant was guilty as charged.

"*6. Has the Employer applied its rules, orders and penalties evenhandedly and without discrimination to all Employees?*

"The Union presented a clear pattern that the City discriminates against employees who were active in the Union. Witnesses Talbot and Robinson presented testimony which was not refuted that they had been subject to retaliation for filing a grievance in 1987. They stated their crew was required to dig a trench by hand when the digging equipment sat by at the job site. In [an] April 1997 letter resolving a grievance on 'breaks,' the City unilaterally rescinded previous memorandums and threatens employees with adverse personnel actions. In this case a rookie steward was terminated for a phone call which did not cause harm.

"The City presented no contrary evidence and so the Arbitrator concludes that the Employer discriminated against employees who exercised their rights to union activity.

"No, the Employer has not applied its rules, orders and penalties evenhandedly and without discrimination to all Employees."

The court has a very limited scope of review when considering whether to set aside an arbitrator's decision. See *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 942, 131 L. Ed. 2d 985, 115 S. Ct. 1920 (1995) (the court's review of an arbitrator's decision is quite limited); *Paperworkers v. Misco*, Inc., 484 U.S. 29, 36, 98 L. Ed. 2d 286, 108 S. Ct. 364 (1987) (noting that courts play a very "limited role when asked to review the decision of an arbitrator"); *Six Flags v. International Broth. of Elect. Workers*, 143 F.3d 213, 214 (5th Cir. 1998) (noting that review of an arbitration award is "extremely limited"); *ARW Exploration Corp. v. Aguirre*, 45 F.3d. 1455, 1462 (10th Cir. 1995) (the scope of review of an arbitrator's decision is "among the narrowest known to the law"); *Ethyl Corp. v. United Steelworkers of America*, 768 F.2d 180, 183 (7th Cir. 1985) (the scope of judicial review for an arbitration award is "extremely narrow"); *Nat. Roofing Ser. v. Lovering-Johnson*, 53 F. Supp. 2d 1142, 1144 (D. Kan. 1999) (noting that the court has a limited scope of review of an arbitrator's decision and that an award will be set aside only in "very unusual circumstances"); and *Allied Bldg. Products v. Local No. 247*, 774 F. Supp. 1066, 1068 (E.D. Mich. 1991) (noting that courts have "typically been reluctant to overturn an arbitrator's award").

In *Foster v. Turley*, 808 F.2d 38 (10th Cir. 1986), the 10th Circuit Court of Appeals stated:

"Once an arbitration award is entered, the finality that courts should afford the arbitration process weighs heavily in favor of the award, and courts must exercise

great caution when asked to set aside an award. [Citation omitted.] Because a primary purpose behind arbitration agreements is to avoid the expense and delay of court proceedings, [citation omitted] it is well settled that judicial review of an arbitration award is very narrowly limited." [Citation omitted.] 808 F.2d at 42.

In discussing the finality of an arbitration award, the court, in *Allied Building Products*, stated:

"Once the parties have decided to settle their dispute through arbitration and once they have chosen a mutually acceptable arbitrator, the courts have only disturbed an award for the most egregious of breaches by the arbitrator. For all practical purposes, the arbitrator's award—assuming that it does not involve fraud or overreaching—must be counter-factual or directly contrary to the plain language of the contract to merit judicial intervention." 774 F. Supp. at 1069.

This court discussed the very limited scope of review in *Coleman v. Local No. 570*, 181 Kan. at 975-76, stating:

"Arbitration awards, which courts regard as valid and suitable for judicial enforcement, are neither contract nor judgment but partake of the nature of both. The award partakes of the nature of a contract because it is the result of a contract, the submission agreement, whereby the parties agree to comply with the award. It differs from a contract in that it is the act of the arbitrators, not of the parties themselves. It partakes of the nature of a judgment in that, if it is valid, it is binding upon them though imposed by an outside source.

"The dual nature of the award serves to explain the limited grounds on which it may be successfully impeached. In general it may be said that the ground urged must be good, both for attack upon a judgment and for relief against the terms of a contract. But, certain grounds that would be sufficient in an appeal from a judgment would not be grounds for impeaching an award, for the reason that the contractual element is present in the award. Thus, the fact that the arbitrator made erroneous rulings during the hearing, or reached erroneous findings of fact from the evidence, is no ground for setting aside the award, because the parties have agreed that he should be the judge of the facts. *Even his erroneous view of the law would be binding, for the parties have agreed to accept his view of the law.* Were it otherwise in either of these cases, arbitration would fail of its chief purpose; instead of being a substitute for litigation, it would merely be the beginning of litigation. Error of law renders the award void only when it would require the parties to commit a crime or otherwise violate a positive mandate of the law. [Citation omitted.]

"Judicial intervention is ill-suited to the special characteristics of the arbitration process in labor disputes. Dean Harry Shulman summarized his vast and extraordinarily successful experience as labor arbitrator as follows:

' . . . The arbitration is an integral part of the system of self-government. And the system is designed to aid management in its quest for efficiency, to assist

union leadership in its participation in the enterprise, and to secure justice for the employees. It is a means of making collective bargaining work and thus preserving private enterprise in a free government. When it works fairly well, it does not need the sanction of the law of contracts or the law of arbitration. It is only when the system breaks down completely that the courts' aid in these respects is involved. But the courts cannot, by occasional sporadic decision, restore the parties' continuing relationship; and their intervention in such cases may seriously affect the going systems of self-government. When their autonomous system breaks down, might not the parties better be left to the usual methods for adjustment of labor disputes rather than to court actions on the contract or on the arbitration award?' " (Emphasis added.)

A court must affirm an arbitration award as long as the arbitrator is acting within the scope of his or her authority. The court is bound by an arbitrator's findings of fact and conclusions of law so long as any error is not in bad faith or so gross as to amount to affirmative misconduct. *Paperworkers v. Misco, Inc.*, 484 U.S. at 38. An arbitration award will be upheld if it "draws its essence from the collective bargaining agreement." *Steelworkers v. Enterprise Corp.*, 363 U.S. 593, 597, 4 L. Ed. 2d 1424, 80 S. Ct. 1358 (1960). It is not the function of the courts to hear the case de novo or to consider the evidence presented to the arbitrators. *Evans Electrical Constr. Co. v. University of Kansas Med. Center*, 230 Kan. 298, 307, 634 P.2d 1079 (1981).

While the arbitrator may have used some loose language, we are satisfied from a reading of his arbitration award that he did not exceed the authority he was granted by the parties, and under the line of cases set forth above, his decision should have been affirmed.

The district court is reversed, and the case is remanded with instructions to reinstate the arbitrator's award.

ALLEGRUCCI, J., concurring in the result.