(286 P.3d 570)
No. 106,845

UNIFIED GOVERNMENT OF WYANDOTTE COUNTY/KANSAS CITY, KANSAS, *Appellant*, v. IBEW LOCAL 53 (In Re: Termination of Anthony Herron), *Appellee*.

Opinion filed August 24, 2012.

*Carl A. Gallagher*, of McAnany, Van Cleave & Phillips, P.A., of Kansas City, for appellant.

*Scott L. Brown*, of Blake & Uhlig, P.A., of Kansas City, for appellee.

Before PIERRON, P.J., GREEN and LEBEN, JJ.

PIERRON, J.: The Unified Government of Wyandotte County/ Kansas City, Kansas, (UG) appeals the district court's refusal to overturn an arbitrator's award reducing construction worker Anthony Herron's discharge to a suspension. We affirm.

This appeal arises out of the arbitration undertaken by the parties regarding the discharge of an employee of UG's Water Pollution Control Division. The employee, Herron, was protected by the provisions of the Memorandum of Agreement (MOA) previously negotiated between the International Brotherhood of Electrical Workers, Local 53 (IBEW) and UG. Under this contract, the issue of whether UG had "just cause" to terminate Herron's employment was submitted to arbitration. The arbitrator elicited testimony at a hearing as well as legal arguments in the form of briefs and rendered a decision in favor of Herron and IBEW. The arbitrator ordered UG to reduce Herron's discharge to a suspension. At UG's request, the district court reviewed the contract between the parties, the decision of the arbitrator, and the legal arguments of the parties, and then issued a memorandum decision affirming the arbitrator's decision.

We start with the facts as found by the arbitrator. Herron began working for UG on April 6, 2000, and at the time of his discharge he was a Construction Worker III. On the morning of July 26, 2010, Herron was working with a four-person crew, including employees Macan, Rangel, and Walker. Walker was the senior crewmember, but he had assigned foreman duties to Herron for the day. At around 7 a.m., Herron asked Rangel to "get the shovels," which meant, among other things, open the manhole at the project site. When Herron, Macan, and Walker arrived at the site, Herron saw

Rangel sitting down and the manhole unopened. Herron asked Rangel why the manhole had not been opened. At the same time, Herron and Walker were joking about how to get a concrete truck to the site to fill the trench, which had to be dug to reach the line being plugged. Rangel suggested that the crew "put the dirt back." Herron told Rangel that when he had his own crew, he could decide how to fill the hole. Herron and Rangel exchanged words as Macan and Walker dug the trench.

At some point, Herron asked Rangel if he had something to get off his chest. Rangel testified he responded by saying, "Whatever. Then [Herron] started staring at me and calling me a pussy. [I] said shut the fuck up and leave me alone." Herron said it was then that Rangel "bumped" him. Macan told UG that Rangel "pushed [Herron] and they started wrestling around a little bit." Walker told UG that Rangel "bumped" Herron and Herron "bumped him back." Then Herron "hit" Rangel. Rangel grabbed a trenching shovel but did not swing it at Herron. The two employees scuffled but were quickly separated by Macan and Walker. Following the incident, Herron admitted he had "lost it" and was angry at himself for not keeping his cool.

Rangel called the supervisor, who took statements from the entire crew. Walker told UG that "both men were in the wrong . . . [and] should not have been in this fight." The supervisor's incident report read that Rangel was "punched in the face by a coworker and pushed to the ground." It also read that Rangel had sustained "contusions to face, back, loose teeth and cut and swollen lip."

On July 26, 2010, UG suspended Herron for assaulting Rangel. Herron's suspension letter advised that UG would recommend termination to the deputy county administrator. UG ultimately discharged Herron.

On July 27, 2010, Rangel saw a doctor, who reported Rangel had a "facial contusion and lumbar contusions" and sent him back to work. That same day, Rangel filed a "report by injured employee" stating that he had been "assaulted on the job site by a coworker and that he had sustained injuries to his teeth, nose, hand and back."

On August 23, 2010, IBEW filed a Step 3 grievance form declaring that Herron had been discharged "without just cause" and requested that he be reinstated with full back pay and benefits. On October 5, 2010, UG responded by stating that while it agreed with IBEW that Herron was "a very good employee and this was a very unfortunate incident in that [Herron] regrets his actions;" it was denying the grievance because "reinstatement of [Herron] would be setting a very bad precedent."

The IBEW and UG had entered into a MOA through the negotiation process which provided arbitration in cases such as these. After the parties sought arbitration of the matter, a hearing was held on March 4, 2011. The issue submitted for a final and binding decision was stated as follows: "[W]hether the Grievant, Anthony Herron, was discharged for just cause; and, if not, what is the proper remedy?"

UG claimed it had just cause to discharge Herron. IBEW countered that mitigating circumstances justified Herron's reinstatement. The arbitrator noted that UG had discharged Herron for assaulting a coworker, both parties agreed that fighting on the job was a serious offense requiring discipline, and UG bore the burden of proving just cause by clear and convincing evidence.

The arbitrator began his analysis by setting out a five-part test to determine whether there was just cause for Herron's termination, citing one of his previous arbitrations, *In re Unified Government of Wyandotte County/Kansas City, Kansas and Fraternal Order of Police, Lodge No. 40*. The arbitrator found that the first four requirements were undisputed: (1) the employee's conduct (assault) was a violation of a rule reasonably related to the safe operation of the employer's enterprise; (2) the employee had notice of disciplinary consequences—Herron had received training on workplace violence; was a foreman who knew or should have known that fighting would result in discipline; and he admitted "losing it" and was mad at himself for his misconduct; (3) the relevant facts supported the charge against the employee—Herron had hit Rangel causing harm to Rangel's mouth and back; and (4) whether the discipline was consistent with the employer's past actions in similar situations—this was UG's first assault incident.

The fifth and final requirement—whether the discipline was appropriate considering the seriousness of the infraction, the employee's work record, and the mitigating circumstances—was deemed to be "the crux of th[e] arbitration." The arbitrator found that the following mitigating circumstances supported reduced discipline: (1) Herron had been a good employee for almost 10 years and had been promoted to foreman in part because of his good work record; (2) Rangel had provoked Herron by bumping him (citing *Lennox Manufactures*, 119 Lab. Arb. Rep. [BNA] 405, 409 [2003] [Hoh, Arb.], for the proposition that provocation is mitigating factor if it causes an employee to lose temporary control of emotions and act out of irritation); and (3) Herron was "truly and genuinely remorseful" immediately after his altercation with Rangel (citing *Clow Water Systems Co.*, 102 Lab. Arb. Rep. [BNA] 377, 380 [1994] [Dworkin, Arb.], for the proposition that an employee's honest remorse is a mitigating factor).

We note some chance for confusion in the language used. While UG probably had "just cause" to discharge Herron, the issue on appeal is the level of punishment.

Due to the mitigating circumstances, the arbitrator exercised his power under the MOA's "unusual provision" that gave him "discretion to reduce or raise discipline imposed." He ordered UG to reduce Herron's discharge to a suspension and reinstate him without back pay or benefits.

UG sought review of the arbitrator's award in the district court. The court rejected UG's argument that the MOA mandated immediate termination of an employee who assaults another employee: "[Section 11.2] authorizes immediate termination for assault. It does not mandate it, and provides that assault among other things constitutes 'justification' for immediate termination." The court affirmed the arbitrator's award, finding it was not arbitrary, capricious, and/or unreasonable. UG timely appeals.

UG argues the district court should have vacated the arbitrator's award because it was arbitrary, capricious, and unreasonable. We have very limited review of this issue. An appellate court must affirm an arbitration award as long as the arbitrator acted within the scope of his or her authority, and is bound by an arbitrator's

findings of fact and conclusions of law unless an error was made in bad faith or amounts to affirmative misconduct. *City of Coffeyville v. IBEW Local No. 1523*, 270 Kan. 322, 334, 336, 14 P.3d 1 (2000). Moreover, the parties' MOA allows for judicial review of an arbitrator's award, but permits the district court to "only determine whether the Arbitrator's decision was 'arbitrary, capricious and/or unreasonable.' "

The Kansas Supreme Court has defined "unreasonable" as "action taken without regard to the benefit or harm to all interested parties," and "arbitrary and capricious" as action that is "unreasonable or without foundation in fact." *Peck v. University Residence Committee of Kansas State Univ.*, 248 Kan. 450, 456, 807 P.2d 652 (1991) (reviewing administrative decision under Kansas Judicial Review Act).

### *The Arbitrator Had Authority to Reduce Herron's Discipline.*

First, UG claims the arbitrator lacked authority to modify Herron's discipline because the MOA mandates termination of employees who assault or batter other employees. IBEW counters that UG cannot raise this issue after conceding it at arbitration. We will address the issue because UG raised it before the district court.

UG and IBEW entered into a MOA under K.S.A. 75-4330(a). See K.S.A. 75-4330(b) (MOA can contain grievance procedure and provide for impartial arbitration of disputes arising from interpretation of MOA). Article 11 of the MOA concerns the discipline of an employee:

"11.1 GENERAL
. . . Employees, excluding probationary employees, shall only be disciplined or discharged for just cause. . . .
11.2 IMMEDIATE TERMINATION
The following reasons, by themselves, shall be considered *justification for immediate termination* of employees covered by the Memorandum of Agreement . . . .
. . . .
    (e)   Assault and/or battery upon a supervisor or another employee.
. . . .
"11.4 DISCIPLINE
    Upon violation of one or more of the reasons referenced below, the employee shall receive a first warning . . . oral or written. Upon a second violation of the same nature . . . written warning . . . . A third violation . . . written warning and

a three (3) days' suspension, without pay. . . . A fourth violation . . . within any consecutive twelve (12) month period, shall result in the termination of the employee.

> . . . .

Violations pertinent to Section 11.4 shall include but not be limited to:
    (a) Insubordination

> . . . .

    (l) Violation of Department Rules and Regulations."

Article 12 of the MOA deals with the grievance procedure:

"<u>Step 4 - Arbitration:</u>

> . . . .

    (d)  The Jurisdiction and authority of the arbitrator shall be governed by the following:

> . . . .

    2.  The Arbitrator shall have no power to add to, subtract from or modify any of the terms of this Memorandum.

> . . . .

    4.  The Arbitrator shall have no authority to substitute his judgment for that of the management of the UG, Division or Administrator . . . *except that he shall have discretion to reduce or raise discipline imposed.*" (Emphasis added.)

The primary rule for interpreting a written contract is to ascertain the intent of the parties. If the contract's terms are clear, such intent is to be determined from the contract's language without applying rules of construction. *Osterhaus v. Toth*, 291 Kan. 759, 768, 249 P.3d 888 (2011). And contractual provisions must be construed together and in harmony rather than in isolation. 291 Kan. at 778.

Section 11.2 does not provide that assaulting another employee mandates immediate termination. It does, however, set assault apart from Section 11.4 conduct, like insubordination, requiring three warnings before termination. But even if Section 11.2 does, as UG claims, confer just cause to fire Herron, MOA provisions must still be construed together. Section 12.3 permitted the arbitrator to reduce Herron's discharge to a suspension.

In *Weems v. Buildex, Inc.*, 8 Kan. App. 2d 321, 325, 657 P.2d 72 (1983), this court explained an arbitrator's common role:

" 'In many disciplinary cases, the reasonableness of the penalty imposed on an employee rather than the existence of proper cause for disciplining him is the

question an arbitrator must decide. This is not so under contracts or submission agreements which expressly prohibit an arbitrator from modifying or reducing a penalty if he finds that disciplinary action was justified, but most current labor agreements do not contain such limiting clause.' "

UG claims the reduction of Herron's discipline was arbitrary, capricious, and unreasonable because the arbitrator failed to consider the harm to all interested parties and made factual findings not supported by the evidence.

The arbitrator applied a test similar to a seven-part test, which our Supreme Court has recognized as a proper tool for arbitrators to use in making just cause rulings in discharge cases:

"(1) Did the employer give the grievant forewarning or foreknowledge of the possible or probable disciplinary consequences of the grievant's conduct? (2) Was the employer's rule or managerial order reasonably related to the orderly, efficient, and safe operation of the company's business and the performance that the employer might properly expect from the employees? (3) Did the employer, before administering discipline to the grievant, make an effort to discover whether the grievant did in fact violate or disobey a rule or order of management? (4) Was the employer's investigation conducted fairly and objectively? (5) Did the investigator obtain substantial evidence or proof that the grievant was guilty as charged? (6) Has the employer applied its rules, orders, and penalties evenhandedly and without discrimination to all employees? and (7) Was the degree of discipline administered by the employer reasonably related to the seriousness of the grievant's proven offense and the record of the grievants's service to the employer?" *City of Coffeyville*, 270 Kan. at 330

But in this case, the arbitrator used the test to decide whether he should reduce Herron's discipline. We believe that was appropriate.

The arbitrator's use of the test's appropriateness/reasonableness prong was far from unreasonable. Before exercising his discretion to reduce Herron's discipline, the arbitrator made factual findings regarding Herron's work record (good employee for almost 10 years and was promoted to foreman) and other mitigating circumstances (Herron was provoked and was genuinely remorseful about assaulting Rangel). These findings suggest the arbitrator believed UG would not be harmed by Herron's continued employment and that Herron would benefit from a chance to redeem himself. Keep in mind that this award does not mean every UG employee who

assaults another employee will be reinstated—not every arbitrator will exercise his or her discretion to reduce discipline, not every employee will have a sparkling work record, and not every situation will have compelling mitigating circumstances. Finally, because of the rule against reweighing evidence, we cannot consider UG's claim that Herron was not truly sorry about hurting Rangel.

Therefore, the district court did not err in finding that the arbitrator's award was not arbitrary, capricious, or unreasonable.

Affirmed.