[Civ. No. 39792. Second Dist., Div. Two. Nov. 6, 1972.]

SAN LUIS OBISPO BAY PROPERTIES, INC., Plaintiff and Appellant, v. PACIFIC GAS AND ELECTRIC COMPANY, Defendant and Respondent.

558

## Counsel

Crossman, Weaver & Geihs, Gerald C. Weaver, O'Melveny & Myers and Richard C. Bergen for Plaintiff and Appellant.

Charles T. Van Deusen, Richard A. Clarke, J. Bradley Bunnin and James C. Logsdon for Defendant and Respondent.

## OPINION

**HERNDON, J.**—This appeal is taken from a judgment confirming an arbitration award. The major issue is whether or not the trial court erred in rejecting appellant's contention that as a matter of law the arbitrator who made the award was disqualified by reason of undisclosed relationships. The challenged award was based upon the arbitrator's appraisal of appellant's leasehold interest in certain parcels of real property situated on the coast in San Luis Obispo County.

In 1966, Luigi Marré and Cattle Company entered into a lease with San Luis Obispo Bay Properties, Inc. (appellant), leasing to appellant certain parcels of coastal land (designated as parcels P, T, R and L) for a period of 99 years with options to renew.

Appellant in turn subleased certain interests in parcels P, T, and R to Pacific Gas and Electric Company (respondent). In lieu of paying cash rental, respondent agreed to guarantee the repayment of loans or advances made to appellant by third party lenders. The amount of the loans to be guaranteed was to be established by appraisers' opinions of the market value of appellant's leasehold interests in all four parcels. The initial maximum amount of loans to be guaranteed was set at $6,420,000. The sublease further provided that at intervals of not less than three years, the interest of appellant in the four parcels would be appraised, upon the request of either party, and a new maximum for the guaranty would be established in the amount of the appraisal.

Upon execution of the sublease, respondent petitioned the Public Utilities Commission for approval of the guaranty arrangement, as required by section 830 of the Public Utilities Code. The approval was granted.

In 1969, respondent requested an appraisal. The parties agreed upon and retained Robert Gandy, who appraised appellant's interest at $17,141,000. A dispute developed over that appraisal and whether Gandy had appraised in accordance with accepted land appraisal practices. In order to settle this dispute and by way of compromise, the parties entered into a "Modification Agreement." This agreement provided that the disputed Gandy appraisal would have no force or effect and that the guaranty would be raised to $9,000,000 until a new maximum was established by a new appraisal.

With respect to that new appraisal, the agreement provided that appellant would employ E. R. Holabird and that respondent would employ Shattuck

& Company to appraise appellant's interest. In the event that they were unable to agree, they would select a third appraiser to function as an arbitrator. Prior to his selection, the two named appraisers would prepare a statement setting forth the areas of agreement and disagreement and their respective positions. It was further agreed that the third appraiser would independently review these statements, make such other investigation as he should see fit, and reach a conclusion on the matters not agreed upon and on the final opinion of value.

Mr. Holabird and Mr. Kurt Shelger, principal in Shattuck & Company, were unable to agree upon an opinion of value, and Stanley Goode, Jr., was selected as arbitrator. Holabird and Shelger prepared a joint statement setting forth their areas of agreement and disagreement.[1]

Mr. Goode appraised appellant's interest in the subject properties at $5,387,000. In addition, he appraised the value of the contracts of guaranty at $1,000,000, yielding a total of $6,387,000.

The modification agreement provided that the parties would promptly accept this valuation. Appellant, however, refused to accept it and filed in the court below a petition for an order vacating the arbitration award, initially on the sole ground that the arbitrator had exceeded his powers. In an amended petition, appellant added allegations to the effect that undisclosed relationships between Goode and respondent had existed that created an "impression of possible bias." A second amended petition added a third ground based on the 1966 order of the Public Utilities Commission.

The court below denied appellant's petition and granted respondent's petition to confirm the award, together with costs and attorney fees. This appeal is from that judgment.

Appellant advances several contentions: (1) that the award must be set aside because it represents an obvious error of fact and is manifestly unjust; (2) that the neutral arbitrator failed to comply with the provisions of the submission agreement; (3) that the trial court failed to make all

---

[1]Neither party complains of the action of the two appraisers in filing a joint statement rather than separate statements. The joint statement indicates that they failed to agree on (a) the enhancement in value of appellant's interest in parcels P, T, R and L as a result of the guaranty provisions of the lease between appellant and respondent; (b) the analysis and interpretation of the various comparable sales used by them in arriving at their opinions of value; and (c) the final opinion of value of appellant's interest in parcels P, T, R and L. Although they purported to agree upon the value of appellant's residual interest in parcels P and T, there in fact was disagreement and this was known to Mr. Goode prior to completion of his appraisal.

necessary findings of fact; (4) that the relationship between the neutral arbitrator and respondent's arbitrator creates an impression of possible bias; (5) that the relationships between the neutral arbitrator, the Irvine interests and respondent's director and executive officer combine to create an impression of possible bias; and (6) that the court erred in granting respondent attorney fees.

### The Award Cannot Be Set Aside as Obviously Erroneous

In 1966, the Public Utilities Commission, in its opinion and order authorizing and approving the guaranty provisions of the sublease, stated: "The utility's contingent liability under the aforementioned contracts is set forth in the sublease at an initial maximum amount of $6,420,000 based on the fair market value of land securing the liability. This maximum amount may be increased or decreased as a result of future appraisals, but in no event will applicant's liability exceed $20,000,000." It is conceded that this valuation did not include any increase in value due to the guaranty provisions of the sublease.

From this basis, appellant's contention proceeds: Goode's valuation of appellant's leasehold interest in 1969 (without the added increment for the value of the guaranty) was $5,387,000—over $1,000,000 less than the agreed value of the same interest in 1966. Appellant then asks this court to take judicial notice of the fact that virgin coastline land has not decreased in value over the three-year period, or at least not that significantly.[2] Based on this premise that the land value could not have decreased that significantly, we are asked to set aside the award as grossly inadequate.

We approach this issue mindful of the " ' "strong public policy in favor of arbitration, of settling arbitrations speedily and with a minimum of court interference and of making the awards of arbitrators final and conclusive." ' " (*Lesser Towers, Inc.* v. *Roscoe-Ajax Constr. Co.,* 271 Cal.App. 2d 675, 702 [77 Cal.Rptr. 100].) The Supreme Court has made it clear that: " 'Neither the merits of the controversy . . . nor the sufficiency of the evidence to support the arbitrator's award are matters for judicial review.' [Citation.] . . . [The court] may not substitute its judgment for

---

[2]$5,387,000 is approximately 16 percent less than $6,420,000. If we assume that the rate of inflation over the three years was 10 percent for the entire period, the Goode appraisal would represent approximately a 23 percent decrease in value expressed in constant dollars.

that of the arbitrators." (*Morris* v. *Zuckerman*, 69 Cal.2d 686, 691 [72 Cal.Rptr. 880, 446 P.2d 1000].)

In light of the above, it is questionable whether we could properly overturn the award on the basis of appellant's contention even if we were more impressed with its intrinsic merit than we are. There is some authority, however, for the proposition that an arbitration award can be overturned upon a showing of constructive fraud (e.g., *Kinkle* v. *Fruit Growers Supply Co.,* 63 Cal.App.2d 102, 108 [146 P.2d 8]), and so we will assume, without deciding, that an error in an arbitration award of the nature here asserted might be so gross and palpable that judicial intervention would be proper.[3]

Even making this assumption, however, appellant's contention is not persuasive. In the first place, there is a serious question as to whether the commission's statement is a *finding* of the value in 1966, in which case the courts of this state (except for the Supreme Court, in certain instances) are bound by that determination (Pub. Util. Code, § 1759; *Pratt* v. *Coast Trucking Inc.,* 228 Cal.App.2d 139 [39 Cal.Rptr. 332]) or *merely a recital of the provisions of the sublease.* If the latter, appellant's contention is based upon a false premise. But even assuming that the commission's ruling involved a determination of the value in 1966, it could not be determinative of the value in 1969; and indeed the opinion explicitly recognizes that the amount of respondent's guarantees "may be increased *or decreased* as a result of future appraisals." (Italics added.)

Nonetheless, appellant urges us to take judicial notice of the fact that California virgin coastal real estate had not decreased this much in value between 1966 and 1969.

Judicial notice is appropriate only with respect to facts and propositions of generalized knowledge that are so universally known that they cannot reasonably be the subject of dispute. (Evid. Code, § 451.) ▆ "If

---

[3]Appellant places primary reliance on the following language from *Campbell* v. *Farmers Ins. Exch.,* 260 Cal.App.2d 105, 112 [67 Cal.Rptr. 175]: "[W]here the error appears on the face of the award and causes substantial injustice, the award may be vacated." In *Campbell,* however, the error on the face of the award was of a wholly different nature; there, the arbitrators had rendered an award of $15,000 (less medical payments) even though there was a $10,000 limit in the insurance policy for injuries sustained by a single person.

If there were a minimum amount set on the property by virtue of the parties' agreement, or if the 1966 decision of the Public Utilities Commission operated to set such a minimum, *Campbell* would be controlling. But such is not the case here.

there is any doubt whatever either as to the fact itself or as to its being a matter of common knowledge, evidence should be required." (*Barreiro* v. *State Bar,* 2 Cal.3d 912, 925 [88 Cal.Rptr. 192, 471 P.2d 992].)

Appellant points primarily to the general inflationary spiral as indicating the impossibility of a decrease in value. Respondent, on the other hand, argues that there were also adverse factors operating at this time, such as the high cost of money and the increasing public pressures for legislative limitations upon the use and development of coastal properties.

■ While we might properly take judicial notice of the inflationary trend and its effect upon real property values *in general,* we would deem it improper to take judicial notice of the extent to which such a general trend had affected the value of leasehold interests in specific parcels of land during the period of time in question. ■ By the same token, we might conceivably take judicial notice of the existence of some of the adverse factors cited by respondent, but we would deem it beyond the scope of judicial notice to attempt a judicial *measurement* of the effect of such factors upon the value of leasehold interests in specific parcels of land.

### The Neutral Arbitrator Complied with the Submission Agreement

■ The powers of an arbitrator are limited by the agreement or stipulation of submission (*O'Malley* v. *Petroleum Maintenance Co.,* 48 Cal.2d 107, 110 [308 P.2d 9]) and the courts will vacate an award where the arbitrator exceeded his powers and the award cannot be corrected without affecting the merits (Code Civ. Proc., § 1286.2, subd. (d)).

Appellant advances three independent theories here. In the first, he posits that the neutral arbitrator was bound by the terms of the submission agreement to accept as binding the areas upon which the first two appraisers had agreed. Based on Mr. Goode's statement that "this is kind of an impractical sort of limitation to place on an appraiser . . .,[4] ap-

---

[4]"Q. Did you assume that your limitations also included that you were limited to areas of disagreement among the parties rather than reappraising areas of agreement? A. Well, that is kind of an impractical sort of a limitation to place on an appraiser for a couple of reasons. One is: If there is no area of disagreement, it would hardly make sense to go into that area; and two, if I did feel that both were wrong, I would want to be and was sure. For example, in a factual situation if they were both off 500 acres in the area of the property even though they both agreed on the area, I would still reserve the right to use the correct acreage if the facts supported that information. I don't mean that it did; that's only an example. But as an appraiser, I would hardly go in and base an opinion on an erroneous fact if I knew it."

pellant urges that Goode either misconceived his powers and duties or deliberately chose to ignore them.

A fair reading of Goode's statement indicates that he was answering hypothetically; it fails to indicate that he did not, in fact, adhere to this limitation. Quite to the contrary, the trial court specifically found that Goode did, in fact, accept the matters which the other two appraisers had agreed upon. Appellant makes no contention that this finding is not based on substantial evidence; accordingly, we are bound by the trial court's finding.

Appellant contends further that Goode failed to adhere to accepted land appraisal practices because he simply "split the difference" between the appraisals of Holabird and Shelger on the value of appellant's residual interest in parcels P and T. The evidence indicates, however, that Goode reviewed their reports and looked at the property and market data. On the basis of this analysis, he concluded that both figures were good appraisals and that there was no objective basis for preferring one over the other, and so he took a value midway between the two. This is quite different from the picture of an arbitrary and unthinking process that appellant strives to paint, and on this posture we cannot say that the trial court's finding that Goode conducted his appraisal in accordance with accepted appraisal practices lacked a substantial basis in the evidence.

Finally, appellant contends that the appraisal, which was to be based on appellant's land development plan and the degree of implementation thereof, was based on the wrong plan. There was at the time a plan on file with the county. There was also an economic analysis and land use plan review prepared by the firm of Daniel, Mann, Johnson and Mendenhall ("DMJM Report"). Goode based his appraisal on the basis of this DMJM Report.

Mr. Holabird, the appraiser employed by appellant, was of the opinion that the plan on file with the county was the one to be referred to and that the DMJM Report was merely a suggestion. On the other hand, there was evidence that the DMJM Report had been prepared by appellant's president for the purpose of assisting the appraisers and that appellant's president had informed Goode of the essential contents of the filed plan, which apparently was rather nonspecific, and thereafter dwelt on the DMJM Report as indicative of the type of land use proposed for the property.

Under these circumstances, it would appear that the question of whether

"appellant's land development plan" was the filed plan, the DMJM Report, or a combination of both, was a question of fact for the arbitrator. If so, it is beyond the province of either the trial court or this court to review that decision on its merits or to pass on the sufficiency of the evidence he considered in reaching that conclusion. (*Morris* v. *Zuckerman, supra,* 69 Cal.2d 686.) To the extent that this is a matter judicially reviewable, the trial court did find that Goode's appraisal was based on appellant's land development plan, and, as the outline of evidence above indicates, this finding is based on substantial evidence.

### The Trial Court Made All Necessary Findings of Fact

As an outgrowth of the immediately preceding contention, appellant complains that the trial court erred in denying its request (Code Civ. Proc., § 634) for specific findings as to which plan was "the" plan and upon which plan each of the appraisers based his appraisal.

The black-letter rule is that "findings should properly state only ultimate and not probative or evidentiary facts [citations], and that the finding of the ultimate fact includes the finding of all probative facts necessary to sustain such ultimate finding. [Citations.]" (*South Santa Clara etc. Dist.* v. *Johnson,* 231 Cal.App.2d 388, 405 [41 Cal.Rptr. 846].)

"It still is the rule that the findings of ultimate facts include by necessary intendment the findings on all intermediate facts necessary to sustain them [citation], and where this is so, the court may reject a request for specific findings that in reality is a request for a statement of evidentiary facts. [Citation.] On appeal, reasonable conflicts in the evidence are construed in favor of the findings. [Citation.]" (*Jay* v. *Dollarhide,* 3 Cal. App.3d 1001, 1032 [84 Cal.Rptr. 538].)

As the cases make clear, the purpose behind section 634 is to avoid findings which were "so 'ultimate' that it was extremely difficult, if not impossible, to determine either the factual basis or legal theory of the [trial court's] decision." (*DeArmond* v. *Southern Pacific Co.,* 253 Cal.App.2d 648, 658 [61 Cal.Rptr. 844]; see also, *Ball* v. *American Trial Lawyers Assn.,* 14 Cal.App.3d 289, 307 [92 Cal.Rptr. 228].)

Appellant's contention here boils down to this: If Holabird and Shelger agreed on what appellant's land development plan was, then Goode was bound to accept that area of agreement and if he did not, i.e., if he based his analysis on a different plan, then Goode exceeded his powers. Appel-

lant acknowledges that if Holabird and Shelger did not agree, then it was Goode's function to resolve that conflict and his finding as to which plan was "the" plan would govern.

We view the evidence as more compatible with a finding that Holabird and Shelger did not agree, in which case appellant's contention is concededly nonviable. But assuming that they did agree, the trial court's specific finding that Goode "accepted the matters which the appraisers had in fact agreed upon" answers appellant's contention. Obviously, the trial court was not required to itemize those matters. Accordingly, we hold that the trial court did not err in refusing appellant's request for more specific findings.

### The Relationship Between the Neutral Arbitrator and Respondent Do Not Dictate Vacation of the Award

In *Commonwealth Corp.* v. *Casualty Co.* (1968) 393 U.S. 145 [21 L.Ed.2d 301, 89 S.Ct. 337],[5] the United States Supreme Court, interpreting the federal statutory grounds for vacating an arbitration award, announced the rule that arbitrators must "disclose to the parties any dealings that might create an impression of possible bias." (*Id.* at p. 149 [21 L.Ed.2d at p. 305].) The comparable statutory grounds in California are substantially similar, and the "impression of possible bias" rule has been held applicable in this jurisdiction. (*Johnston* v. *Security Ins. Co.,* 6 Cal.App.3d 839, 841 [86 Cal.Rptr. 133].)

Appellant complains of the nondisclosure of two relationships. The first, between the neutral arbitrator and respondent's appointed appraiser (Shelger), is lacking in substance. Appellant cites only two indicia of this relationship. Goode and Shelger belonged to the same M.A.I. chapter, but membership in the same professional organization is in itself hardly a credible basis for inferring even an impression of bias. (See *St. Paul Insurance Companies* v. *Lusis,* 6 Wn.App. 205 [492 P.2d 575] [neutral arbitrator member of Board of Governors of State Trial Lawyers Assn.; opposing counsel president of that body].)

Goode and Shelger had also referred cases to each other, but only once or twice per year, and never for any kind of consideration. While this latter point presents a closer question, we think it important (though not in itself

---

[5]Hereafter referred to as *Commonwealth Corp.*

determinative) that the references were not made for consideration. The relationship in *Commonwealth Corp.* was a "close financial" one, involving about $12,000 in fees over four or five years. Here there is no showing that Goode and Shelger did anything more than merely refer their overflow cases to other appraisers—presumably to several others as well, since both men had more business than they could handle. It would perhaps be a different matter if they had referred more cases to each other than to other appraisers, or had regularly given each other the first opportunity at a reference (or the first opportunity at particularly desirable cases), but there is no indication of any favoritism or unusual preference here—nothing, in short, that could be fairly said to create an impression of possible bias as a matter of law.

If the impression of possible bias rule is not to emasculate the policy of the law in favor of the finality of arbitration, the impression must be a reasonable one. (See *Commonwealth Corp., supra,* 393 U.S. at p. 150 [21 L.Ed.2d at p. 305]; cf. *Cross Properties, Inc.* v. *Gimbel Brothers, Inc.,* 15 App.Div.2d 913 [225 N.Y.S.2d 1014]; *St. Paul Insurance Companies* v. *Lusis, supra,* 492 P.2d at p. 580.) In the final analysis, each case must depend on its own facts (*Colony Liquor Dist., Inc.* v. *Local 699, I.B.T., C., W. & H.,* 34 App.Div.2d 1060 [312 N.Y.S.2d 403]). We agree with the trial court's conclusion that the evidence relating to the Goode-Shelger relationship was insufficient to create a reasonable impression of possible bias regardless of whether the issue be viewed as one of law or fact or as a mixed question of law and fact.

The second relationship of which appellant complains involves linking Goode and respondent through Mr. Robert Gerdes. Mr. Gerdes has been associated with respondent for almost 30 years. From 1943-1963, he was general counsel and executive vice president of respondent; from 1963-1965, he served as president; from 1965 until his retirement in 1969, he was chairman of the board and chief executive officer; and since 1969, he has remained on the board of directors and served as chairman of the executive committee.

Mr. Gerdes has also had a substantial connection with what can be loosely called the Irvine interests. Of principal interest here, Mr. Gerdes has since 1944 been a director of the James Irvine Foundation, a nonprofit corporation, which throughout this period has held the majority and controlling stock ownership of the Irvine Company. From some time in the late 1940s until 1963, Mr. Gerdes was also a director of the Irvine Company.

There is no indication that Mr. Goode had ever done any prior work for respondent, but his firm (Goode & Goode) had done considerable appraisal work for the Irvine Company—literally hundreds of appraisals, usually four or five in progress at any given time over the period of 1951-1963, and an unspecified (but apparently substantial) amount since then. Mr. Goode had also acted for many years as the Irvine Company's land use consultant.

Appellant contends that the connection between Mr. Goode and the Irvine Company can, because of Mr. Gerdes' prominent position with the Irvine interests and with respondent, be said to create an impression of possible bias in favor of respondent.

The cases recognize that an indirect relationship between the arbitrator and a party can be sufficient to create an impression of possible bias. The most common such relationship has involved dealings between the arbitrator and the attorney for one of the parties (e.g., *Johnson* v. *Security Ins. Co., supra,* 6 Cal.App.3d 839, 841; *Milliken Woolens, Inc.* v. *Weber Knit Sportswear, Inc.,* 11 App.Div.2d 166 [202 N.Y.S.2d 431]).

 We hold that the relationship between Mr. Goode and respondent is not sufficient to raise an impression of possible bias. While it is true that Mr. Gerdes was a prominent figure in both the Irvine interests and respondent, each of these corporations is a legal entity distinct from its officers and directors. There is no evidence nor any suggestion that Mr. Gerdes dominated any of the corporations, or that any of them was in any sense his *alter ego*. And, other than Mr. Gerdes' common involvement, there was no relationship between the Irvine interests and respondent; they did no business with each other at all.

Moreover, the trial court found, on the basis of substantial evidence, that Goode and Gerdes did not know one another and that no business or social relationship between them had ever existed.

No reason appears to impose on arbitrators the burden of maintaining and checking the lists of the directors and major officers of each of their past corporate clients against a similar list for the parties to the arbitration. As pointed out in Mr. Justice White's concurring opinion in *Commonwealth Corp.:* "Of course, an arbitrator's business relationships may be diverse indeed, involving more or less remote commercial connections with great numbers of people. He cannot be expected to provide the parties with his complete and unexpurgated business biography." (P. 151 [21 L.Ed.2d

p. 306].) And see *St. Paul Insurance Companies* v. *Lusis, supra,* 492 P.2d at pp. 580-581.

We do not mean to suggest that arbitrators should be at all careless in searching their minds and hearts for relationships that might be suspect. We agree fully with the views expressed by Mr. Justice White in *Commonwealth Corp.* that the arbitration process should be characterized by an atmosphere of frankness at the outset and that arbitrators should err on the side of disclosure. (*Id.* at pp. 151-152 [21 L.Ed.2d at p. 306].) But the relationship here requires more in the way of research than can be fairly demanded before it even begins to appear, and we cannot say that Mr. Goode violated either the letter or the spirit of the disclosure requirements.[6]

### The Trial Court Did Not Err in Awarding Respondent Attorney Fees

Paragraph 22 of the sublease provides: "In case suit shall be brought for an unlawful detainer of said premises for the recovery of any sums due under the provisions of this sublease, or because of the breach of any other covenant herein contained on the part of Pacific to be kept or performed, and Properties shall prevail in such suit, Pacific shall pay to Properties reasonable attorney's fees, which in the absence of agreement as to the amount shall be fixed by the court."

Civil Code section 1717, enacted in 1968, transforms this into a reciprocal provision giving the right to recover attorney fees to whichever party prevails. Section 1717 has been held to have retroactive application. (*System Inv. Corp.* v. *Union Bank,* 21 Cal.App.3d 137, 163-164 [98 Cal.Rptr. 735]; *Coast Bank* v. *Holmes,* 19 Cal.App.3d 581, 593-597 [97 Cal.Rptr. 30].)

Conceding this, appellant contends that the above quoted provision for attorney fees does not apply to this proceeding because it is a "part and

---

[6]We note here that the rules of the American Institute of Real Estate Appraisers would not appear to require disclosure under these circumstances. The trial court had the benefit of the interpretation of these rules by a member of the National Board of Review of that Institute, who gave his expert opinion that they did not require disclosure. Appellant calls our attention to the American Arbitration Association rules, which require a prospective arbitrator to disclose "whether he, his employer, or his firm to his knowledge has had any past or has any current relationship with either of the parties or their counsel, *direct or indirect;* and whether of a financial, professional, social or other kind." (Lawyers Arbitration Letters, No. 17, Feb. 15, 1964; italics added.) As our textual discussion indicates, there is a point at which the relationship becomes too indirect to require such disclosure, and we regard this as such a case.

parcel of the arbitration process and the perfection thereof, rather than a suit for a breach of the Sublease."

The parties agree that the modification agreement is an amendment of paragraph 11b of the sublease and thus a breach of any covenant in the modification agreement would, in the language of paragraph 22, be a breach of a "covenant herein contained." The modification agreement provided, in part: "The parties will promptly accept . . . the final opinion of value by the third [appraiser] for the determination of the maximum amount of [respondent's] liability. under guarantees pursuant to the sublease."

In refusing to accept this valuation, appellant breached its "promptly accept" covenant and, in effect, assumed the risk that the courts might hold that its refusal was not based upon legally tenable grounds. Because appellant refused to accept the arbitration award and filed its petition to vacate it, respondent countered with its petition to confirm the award and this complex litigation ensued. Paragraph 22 of the sublease does not limit the right to recover attorney fees to those incurred in any particular *form* of lawsuit. █ Accordingly, we sustain the trial court's determination that recovery of attorney fees by respondent is provided for by the contract, as modified by operation of Civil Code section 1717. (*Downer Corp.* v. *Union Paving Co.,* 172 Cal.App.2d 126, 129-130 [342 P.2d 64]; *Hunt* v. *Smyth,* 25 Cal.App.3d 807, 832 [101 Cal.Rptr. 4].)

Appellant further contends that, assuming Civil Code section 1717 applies retroactively, there was a bargained-for and conscious waiver by respondent of its right to such fees. █ In large part, this contention is an attempt to resurrect the challenge to the retroactive application of section 1717, for the argument prominently submits that part of the consideration appellant bargained for was the unilateral provision for attorney fees.

Such an argument, of course, could always be made where the parties to a pre-1968 contract were of comparable bargaining power. To accept it would have the effect of limiting the retroactive application of section 1717 to adhesion contracts. It is true that both the *Coast Bank* and *System Investment* cases recognized that the Legislature was *especially* concerned with the problem of unilateral attorney fees provisions in adhesion contracts, but the statutory language is not limited to any particular kind of contract and the facts and language of the *System Investment* case are incompatible with any such limitation.

Nor can respondent be said to have prospectively waived its rights that

were created by section 1717. Again, to accept appellant's contention here would be to destroy the retroactive application of section 1717 to non-adhesion contracts. Moreover, to constitute a waiver there must be an " ' "intentional relinquishment of a *known* right after knowledge of the facts" ' " (*Pechtel* v. *Universal Underwriters Ins. Co.,* 15 Cal.App.3d 194, 204 [93 Cal.Rptr. 53] [italics added]). In *Jones* v. *Brown,* 13 Cal.App.3d 513, 519 [89 Cal.Rptr. 651], the court stated: "We observe further that the valid waiver of a right presupposes an actual and demonstrable knowledge of the very right being waived."

Finally, appellant contends that attorney fees cannot be allowed because respondent failed to plead and prove the underlying contract provision, placing principal reliance on *Genis* v. *Krasne,* 47 Cal.2d 241, a case in which appellants as assignees of lessors sought unsuccessfully to recover the amount of attorneys' fees expended by the lessors in their successful defense of a prior action; no attorney fee was recovered by lessors in the former action.

In *Citizens Suburban Co.* v. *Rosemont Dev. Co.,* 244 Cal.App.2d 666, 684 [53 Cal.Rptr. 551], a similar problem arose, and the court reasoned that "[a]lthough the complaint did not in terms pray for litigation expenses, it sought specific performance of the . . . agreement and incorporated the agreement . . . by reference. The agreement was placed in evidence. Under these circumstances there was adequate pleading and proof of the contract provision under which the award was made. (*Genis* v. *Krasne, supra.*) The issue of attorney fees and expenses was not included in the joint pretrial conference statement or the pretrial order. (There is no assertion of a deliberate omission.) After the principal issues in the case were tried and a decision in plaintiff's favor announced, entitlement to costs and expenses, including attorney fees, was declared in the trial court's conclusions of law. Thereafter a hearing was held upon adequate notice and evidence relative to the award was taken.

"At this point a certain discord arises between the demands of pretrial procedure and traditional equity doctrine. The pretrial order fixes the issues and controls the subsequent course of the case unless later modified. (Cal. Rules of Court, rule 216.) An equity court, on the other hand, will do complete justice between the parties, whether or not the particular relief was requested. [Citations.] In this case the discord is not acute. When an issue has been actually litigated upon adequate notice, the losing party may not object on appeal to the issues non-inclusion in the pretrial order. [Citations.]"

 The case at bar is virtually identical. Although not an action for specific performance in form, a proceeding to confirm an arbitration award is quite similar since it is in a sense an action to compel a party to perform his promise to accept the arbitrator's decision. Here, as in *Citizens Suburban,* the contract was before the court, the attorney fees were first mentioned in the trial court's conclusions of law, and the issue of the propriety of attorney fees was thoroughly debated before the trial court. We think that here also "the discord is not acute" and that the balance tips in respondent's favor.

 As prevailing party on this appeal, respondent is entitled to reasonable attorney fees for services rendered by counsel on this appeal, and the matter may properly be remanded for the addition of this amount. (*Coast Bank* v. *Holmes, supra,* 19 Cal.App.3d 581, 597.)

For the foregoing reasons, the judgment is affirmed and the matter is remanded with directions to the trial court to determine a reasonable attorney fee for services rendered by respondent's counsel on appeal and to add such amount to the fee previously awarded.

Roth, P. J., and Compton, J., concurred.