NOT DESIGNATED FOR PUBLICATION

No. 112,917

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Matter of the Marriage of
LANA SHULTS, now LANA CHARLES,
*Appellee*,

and

CHRIS L. SHULTS,
*Appellant*.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; ERIC A. COMMER, judge. Opinion filed December 23 2015. Affirmed.

*Donald N. Peterson, II* and *Nathan R. Elliott*, of Withers, Gough, Pike, Pfaff & Peterson, LLC, of Wichita, for appellant.

*Stephen P. Weir*, of Stephen P. Weir, P.A., of Topeka, for appellee.

Before POWELL, P.J., PIERRON and LEBEN, JJ.

*Per Curiam*: The property issues in this contentious divorce action were submitted to arbitration by agreement of the parties. The trial court granted a divorce to Christopher Shults and Lana Shults (now Lana Charles), but left the case open for the pending property arbitration. Following the arbitrator's decision and prior to confirmation, the arbitrator, Andrew Fletcher, disclosed he had represented Lana's attorney, G. Knute Fraser, 17 years earlier in a divorce action. Chris claimed the prior attorney-client relationship created a reasonable impression of partiality and the arbitration award should be vacated. The trial court disagreed and found Chris had

1

presented no evident partiality that would permit it to vacate the arbitration award under K.S.A. 5-412. We affirm.

While the valuation of the marital assets and whether which assets are part of the multimillion dollar marital estate are highly contested, the procedural facts necessary for resolution of this appeal are fairly straightforward. Lana and Chris were married on February 21, 2004. This was Lana's third marriage and Chris' second marriage. Neither had any children. In June 2011, Lana filed for divorce. On December 3, 2011, Lana's mother died and she inherited 520 acres in Smith County, Kansas. On December 30, 2011, Lana dismissed the divorce proceedings, but she refiled shortly thereafter on February 3, 2012.

To say this matter was contentious is an understatement. Garnishment orders for support were necessary. Lana had filed a civil lawsuit against Chris for invasion of privacy, breach of contract, and trespass for allegedly obtaining information from her home computer. Discovery was difficult.

Lana and Chris decided to arbitrate the property issues of their divorce. In early November 2012, they signed an Agreement to Arbitrate. At the time, Donald Lambdin represented Lana and John Lehecka represented Chris. Prior to signing the agreement, which named Fletcher as arbitrator, no contact was made with Fletcher by either party or their counsel. The stated purpose of the arbitration agreement was to reduce delays, expenses and the uncertainties and anxieties of litigation. No confirmation of the award entered by Fletcher was necessary. Section 6(A) of the arbitration agreement provided:

> "No confirmation of the award by the Court shall be needed or required. The award shall be fully enforceable as any other Agreement by the parties under the law of the State of Kansas and shall be subjected to an Action of Contempt and Award of Counsel Fees and Costs in the event of non-compliance."

2

Lambdin announced his intent to retire from the practice of law and close his law practice in March 2013. Lambdin filed a motion to withdraw as Lana's attorney in April 2013, and the trial court granted the motion. Five months after the arbitration agreement was signed by the parties, Fraser entered his appearance on April 10, 2013, as Lana's new attorney.

The rub in this case, according to Chris, is the arbitrator's award requiring him to pay an equalization payment in the amount of $1,416,000. Chris' complaint involves the property inherited by Lana after her mother's death and the stock in his computer company. On December 20, 2013, the arbitrator entered his award. The arbitrator's finding regarding the relevant property was as follows:

"[20.] f. <u>Farmland – 520 acres, located in Smith County, Kansas</u>. Both parties agree that the value of the 520 acres at the time of valuation was $1,040,000.00. The Petitioner inherited the property in December 2011. The Respondent presented evidence that at the time of the marriage the Petitioner had a remainder interest in 520 acres of the Kansas farmland in February 2004. Through exhibit B.1 the Respondent's accountant placed a value on the Petitioner's remainder interest in February of 2004 between $175,783.92 and $205,081.24 depending on the per acre value of the Kansas farmland. The Respondent argued that the Arbitrator should use the figure of $175,783.00 as the entry value of Petitioner's remainder interest of the 520 acres at the time of the marriage and subtract that interest from the value of the land ($1,040,000.00) at the time of filing, therefore Petitioner having an increase in value of her interest during the marriage of $865,216.00. The parties through their exhibits and testimony provided evidence that Petitioner inherited the 520 acres from the Estate of Marie E. Tiree, Petitioner's mother. Marie E. Tiree's date of death was December 3, 2011. This divorce case was filed on February 3, 2012, two months after the date of death of Marie E. Tiree. The Arbitrator is going to use the date of the inheritance as the entry value date of Petitioner's interest in the 520 acres. There was no testimony presented that the Respondent made any contribution to this property or as to any increase/decrease in value from the date of the

entry value to date of filing for divorce. The value of this farmland is $1,040,000.00 and is set aside to the Petitioner as inherited property.

. . . .

"[26.] z. [NIC, Inc. stock. In 1991, Respondent and two other individuals began a computer/internet business. Due to Respondent's previous employment/education, the Respondent testified that he was the 'technical person' in the company. In the 1990's, the Respondent's company NIC Inc. had expanded from doing business in Kansas to doing business in a total of 13 states. In 1999, NIC Inc. became a public trade[d] company on the NASDAQ stock exchange. The Respondent received approximately 705,000 shares of stock in NIC Inc. that were placed in a voting trust. At the time of the marriage, the Respondent had already retired from the company (1999) and still owned 662,635 shares. Both the Petitioner and the Respondent agree as to the number of shares of NIC Inc. stock owned by the Respondent at the time of the marriage. The parties also agree, pursuant to their proposed division of assets and liabilities provided to the arbitrator, that the value of the shares was $3,823,400 (pre-tax). The Respondent has submitted through his proposed division of assets and liabilities that after adjusting for taxes, the value of the shares at $3,823,400 would have an after tax value of $2,648,000. The arbitrator is going to use an entry value of $2,648,000 as Respondent's premarital value of the NIC Inc. stock. During the marriage, the stock was removed from the voting trust and the shares of NIC Inc. stock were placed in the trust account that Respondent had at Emprise Bank (account #0202 – Chris L. Chris Trust Agreement DTD 10/29/98).

"At the time of the filing of the divorce, the Respondent owned 608,427 shares of NIC Inc. as set out in both Petitioner's exhibit 3.16a, and Respondent's exhibit E3. The Petitioner's exhibit 3.16a indicates a market value of the NIC Inc. stock of $7,307,160 (pre-tax). The Respondent has placed the value of the shares at $7,234,149 and an after tax value of $5,079,863.

"Since the fling of the divorce, the value of the NIC Inc. stock has increased further in value as testified to by Petitioner's witness, Jeffrey J. Quirin. Under K.S.A. 23-2802, the [trial] Court may consider evidence regarding changes in value of various assets before and after the valuation date in making the division of property.'
After reviewing the exhibits of the parties and testimony of the Respondent, the arbitrator is going to use the date of the filing of the divorce as the date for valuation of the NIC Inc. stock.

"In coming to this decision the arbitrator has taken into account the following:

4

1.      "Time, source and manner of acquisition of the asset

"The Respondent had invested a considerable amount of time and effort in this company prior to the marriage to the Petitioner. The Respondent retired from the company in 1999, approximately 5 years prior to his marriage to the Petitioner. The Respondent owned all of the stock prior to the marriage. There was no evidence presented that the Petitioner made any contributions to NIC Inc. or for the purchase of any shares of the stock in the company after it went public."

On January 13, 2014, shortly after Fletcher entered the award, Chris filed a motion to modify and correct. He challenged the award's inclusion of the increase in his value of his NIC, Inc. stock but not the increase in value of Lana's inherited property as marital assets of the estate. He also claimed error in a $4,000 judgment against him, error in awarding him one of the vehicles with a money judgment attached to it, and error in that he should not have to pay a $2,500 judgment from a law firm. Chris also claimed he should receive a $61,280 credit for prepayment of spousal support and requested a longer time to make a $1.416 million settlement payment. Last, Chris wanted to reopen the arbitration to address tangible personal property items.

Chris also filed several motions to put the case back on the court's docket once he learned of the past attorney-client relationship between Fletcher and Fraser. On April 8, 2014, Fletcher had a phone conference with each counsel where he disclosed that he had just remembered that he had represented Fraser in a divorce action 17 years ago.

At the hearing on Chris' motion to modify the arbitration award and also to put the case back on the court's docket, the trial court heard testimony from Fletcher. His practice was primarily in the area of family law, and he had mediated or arbitrated over 100 cases since 2002. Fletcher testified he had arbitrated cases in the past involving both of the parties' counsel, Fraser and Lehecka. However, when questioned about it later, Fletcher testified that he had not arbitrated any cases where Fraser was the lawyer, but he had arbitrated a case where both Lehecka and Lambdin were the lawyers. Fletcher stated he

5

had represented Fraser in 1997 but no longer had the file because it was over 10 years old. He had not represented Frazer since that time. As to when he had remembered this 1997 attorney-client relationship, Fletcher indicated that as he prepared to address the timeliness of the arbitration decision, "it just came to my mind," that he had represented Frazer in the past. He decided the proper thing to do was to contact both counsel and reveal the information. Fletcher testified this prior relationship did not impact his arbitration decision in any manner and he remained completely neutral. Upon questioning by the court, Fletcher testified he would also continue to be neutral in making further decisions in the case.

On cross-examination, Fletcher repeated that he did not remember representing Fraser 17 years ago when he began the arbitration in this case. That limited questioning was the extent of the cross-examination. Lehecka argued that Fletcher's representation of Fraser created a reasonable impression of partiality and that the arbitrator's decision was also void because it was not made within 20 days. Lehecka relied on *Commonwealth Corp. v. Casualty Co.*, 393 U.S. 145, 89 S. Ct. 337, 21 L. Ed. 2d 301 (1968), and *Schmitz v. Zilveti*, 20 F.3d 1043, 1049 (9th Cir. 1994). The court took a short recess and then returned to give its ruling.

The trial court denied Chris' motions to modify and to put the case back on the court's docket. The court discussed the provisions of the arbitration agreement and the differences in the first agreement signed by the parties and the second agreement tacitly approved. The court also referenced the authorities sited by the parties.

Regarding the timeliness of the arbitration award, the district court found Chris had acknowledged the award, acted in acceptance of the award, and acquiesced in use of the award for resolution of the case. As for the prior representation by Fletcher, the court found Fletcher credible that he had little memory of the case and was unable to locate his file. The court found the parties chose Fletcher because of his experience and ability to be

6

fair. The court indicated the arbitration statutes provided specific methods for "appointment" of arbitrators.

The trial court found the only possible reason for voiding the arbitration agreement in this case under K.S.A. 5-412 was evident partiality by an arbitrator appointed as a neutral or corruption in any of the arbitrators. The court found no evidence of corruption or misconduct prejudicing the rights of any party. The court held that "evident partiality" calls for something greater than simply the potential that one of the parties might think they are biased. The court found no evidence or testimony of evident partiality by the arbitrator. The court also noted the claim of partiality was based on contact with one of the parties' attorneys but not with one of the parties themselves. The court also awarded Lana $4,000 in attorney fees.

The arbitrator issued a revised award in July 2014. Thereafter, Lana filed a motion asking the trial court to approve and confirm the award; Chris filed a motion to vacate the award. He asserted the same argument that the arbitrator's award should be vacated because Fletcher failed to disclose his attorney-client relationship with Fraser. The trial court again denied Chris' motion to vacate the award and clarified several findings. The court concluded that the evident partiality language in K.S.A. 5-412(a)(2) applies only to an arbitrator who is appointed by the court as a neutral and in the present case Fletcher was jointly selected by both parties to serve as the arbitrator pursuant to the arbitration agreement. Consequently, the court found that K.S.A. 5-412(a)(2) was not applicable and there was no evidence of fraud or corruption under K.S.A. 5-412(a)(1). The court also found Chris was prohibited from complaining about Fletcher by a sense of equity similar to the equity of "estoppel by election" since Chris had participated in the selection of Fletcher and could have investigated and raised a complaint upon Fraser's appointment.

7

On appeal, Chris argues the trial court erred by denying his motion to vacate the arbitration award because Fletcher's failure to disclose his prior attorney-client relationship with Fraser had created a reasonable impression of partiality.

*Standard of Review*

An appellate court's standard of review of an arbitration award is highly deferential. The court must affirm an award if the arbitrator acted within the scope of his or her authority. A reviewing court must respect that the parties contractually agreed to be bound by an arbitrator's decision. "Once the parties have decided to settle their dispute through arbitration and once they have chosen a mutually acceptable arbitrator, the courts have only disturbed an award for the most egregious of breaches by the arbitrator." *City of Coffeyville v. IBEW Local No. 1523*, 270 Kan. 322, Syl. ¶ 2, 14 P.3d 1 (2000). As long as the arbitrator's errors are not in bad faith or so gross as to amount to affirmative misconduct, an appellate court is bound by the arbitrator's findings of fact and conclusions of law. 270 Kan. at 336.

Our court has further explained the standard of review for an arbitration decision:

> "'Generally, where the parties have agreed to be bound to a submission to arbitration, errors of law and fact, or an erroneous decision of matters submitted to the judgment of the arbitrators, are insufficient to invalidate an award fairly made. Nothing in the award relating to the merits of the controversy, even though incorrectly decided, is grounds for setting aside the award in the absence of fraud, misconduct, or other valid objections. Further, where an arbitration award made under the Kansas Uniform Arbitration Act is attacked by one of the parties, it is not the function of the court to hear the case de novo and consider the evidence presented to the arbitrators. [Citations omitted.] Ordinarily, an arbitrator's award will not be subject to judicial revision unless such award is tainted or based on an irrational interpretation of the contract. [Citations omitted.]'" *Nowicki v. Project Paint Research Labs*, 40 Kan. App. 2d 733, 737, 195 P.3d 273 (2008) (quoting

8

*Jackson Trak Group, Inc. v. Mid States Port Authority*, 242 Kan. 683, 689, 751 P.2d 122 [1988]).

*Kansas Uniform Arbitration Act*

The Kansas Uniform Arbitration Act, which is set forth at K.S.A. 5-401 *et seq.*, allows a party to appeal from an order confirming or vacating an arbitration award. K.S.A. 5-418(a). A trial court must presume an arbitration award is valid unless there is proof of one of the specific grounds set forth in K.S.A. 5-412(a). *Moreland v. Perkins, Smart & Boyd*, 44 Kan. App. 2d 628, 633, 240 P.3d 601 (2010).

K.S.A. 5-412(a) sets forth five circumstances where an arbitration award must be vacated:

> "(1) The award was procured by corruption, fraud or other undue means;
> "(2) There was evident partiality by an arbitrator appointed as a neutral or corruption in any of the arbitrators or misconduct prejudicing the rights of any party;
> "(3) The arbitrators exceeded their powers;
> "(4) The arbitrators refused to postpone the hearing upon sufficient cause being shown therefor or refused to hear evidence material to the controversy or otherwise so conducted the hearing, contrary to the provisions of K.S.A. 5-405, as to prejudice substantially the rights of a party; or
> "(5) There was no arbitration agreement and the issue was not adversely determined in proceedings under K.S.A. 5-402 and the party did not participate in the arbitration hearing without raising the objection."

*Meaning of Evident Partiality*

Chris argues that Kansas applies a "reasonable impression of partiality" test in determining whether there was evident partiality in the appointment of an arbitrator as a neutral under K.S.A. 5-412(a)(2).

9

Chris relies on *Griffith v. McGovern*, 36 Kan. App. 2d 494, 141 P.3d 516 (2006), in support of his claim. Griffith claimed that she was an elderly retired widow who, based on fraudulent misrepresentations and the withholding of material facts, was prompted to convert her secure investment in certificates of deposit into a high risk portfolio of unsuitable stocks and junk bonds. Griffith filed an arbitration claim with the National Association of Securities Dealers (NASD). For the purposes of the present case, the *Griffith* court rejected her claims of failure to disclose and fraud of one of the arbitrators concerning an unsatisfied judgment and previous child support litigation—both facts not disclosed on the arbitrator's NASD arbitrator application. 36 Kan. App. 2d at 497-99.

In finding that neither of the undisclosed facts supported a claim of "partiality or corruption or misconduct prejudicing the rights of a party," the *Griffith* court held:

"Griffith argues that parties can only choose an impartial arbitrator intelligently when all facts are disclosed. She fails to note that in the key cases upon which she relies the arbitrator was only required to disclose facts which created a 'reasonable impression of partiality.' Thus, in *Commonwealth Corp. v. Casualty Co.*, 393 U.S. 145, 89 S. Ct. 337, 21 L. Ed. 2d 301 (1968), the arbitrators were required to disclose any dealings that may create an impression of possible bias. The court in *Olson v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 51 F.3d 157, 159-60 (8th Cir. 1995), vacated an arbitration award because the arbitrator's failure to disclose his high ranking position within an investment firm, which conducted business with one of the parties, created a reasonable impression of bias. And in *Schmitz v. Zilveti*, 20 F.3d 1043, 1049 (9th Cir. 1994), the court vacated an arbitration award because the arbitrator failed to disclose his firm's previous representation of one of the parties' parent company, a fact which would create a reasonable impression of partiality. Neither the sanctions against Wasserstrom in an unrelated civil suit nor his child support litigation presents the least suggestion that he would be anything other than fair and impartial in arbitrating the issues raised in Griffith's complaint. There simply is no nexus between Griffith's claim and these

unrelated lawsuits that could raise in the mind of any reasonable litigant the prospect of bias or prejudice on Wasserstrom's part." 36 Kan. App. 2d at 497-98.

*Griffith* provides the following rule: "An arbitrator is required to disclose to the parties facts which create a reasonable impression of partiality." 36 Kan. App. 2d 494, Syl. ¶ 3.

Chris also relies heavily on *Commonwealth*, 393 U.S. 145, as cited by the *Griffith* court. In *Commonwealth*, the Supreme Court addressed the "evident partiality" ground set forth in the Federal Arbitration Act, 9 U.S.C. § 10(a)(2). The opinion of the Court, delivered by Justice Black and joined by three other justices, requires that "arbitrators disclose to the parties any dealings that might create an impression of possible bias." 393 U.S. at 149. Justice Black further indicated that arbitrators "not only must be unbiased but also must avoid even the appearance of bias." 393 U.S. at 150. Justice White concurred with Justice Black but wrote separately to state that while he supported a policy of disclosure by arbitrators to enhance the selection process, the concurrence contemplated upholding awards when arbitrators fail to disclose insubstantial relationships. 393 U.S. at 152 (White, J. concurring). Specifically, Justice White wrote that it is "enough for present purposes to hold, as the Court does, that where the arbitrator has a substantial interest in a firm which has done more than trivial business with a party, that fact must be disclosed." 393 U.S. at 151-52 (White, J. concurring).

Because *Commonwealth* was a "plurality-plus" decision, the Circuit Courts of Appeal differ on their interpretation of the holding. See generally *Positive Software Solutions v. New Century Mortg.*, 476 F.3d 278, 282 (5th Cir. 2007). The standard articulated in Justice Black's opinion is often referred to as the broader "appearance of bias standard," and the stricter or narrower standard in Justice White's concurrence is referred to as the "actual bias standard." A majority of Circuit Courts of Appeal have concluded that Justice White's concurring opinion did not lend majority status to the

plurality opinion. 476 F.3d at 282-83 (citing cases). As a result, this view holds that "nondisclosure alone does not require vacatur of an arbitral award for evident partiality. [Rather,] [a]n arbitrator's failure to disclose must involve a significant compromising connection to the parties." 476 F.3d at 282-83.

Our colleagues on the Tenth Circuit Court of Appeals have sided with Justice White's concurring opinion in *Commonwealth*. The Tenth Circuit has held that the evident partiality standard requires "clear evidence of impropriety" where "the evidence of bias or interest of an arbitrator must be direct, definite and capable of demonstration rather than remote, uncertain, or speculative." *Ormsbee Development Co. v. Grace*, 668 F.2d 1140, 1147 (10th Cir. 1982) (refusing to vacate an award or conduct an evidentiary hearing based on the losing party's allegations of partiality arising from alleged connections between the arbitrator and the successful party's law firm). Overt chicanery or misconduct is not required but more than mere allegations of partiality or misconduct are necessary for the court to be willing to question the finding. See *A&A Farms, LLC v. Rural Community Ins. Services*, No. 15-1001-EFM-TJJ, 2015 WL 4478658, at *5 (D. Kan.) (unpublished opinion), (citing *Applied Indus. Materials Corp. v. Ovalar Makine Ticaret Ve Sanayi, A.S.*, 492 F.3d 132, 137 [2d Cir. 2007]).

For emphasis, the *Ormsbee* court repeated its rule: "In order to set an award aside, the evidence of bias or interest of an arbitrator must be direct and definite and capable of demonstration." 668 F.2d at 1150. "The courts should consider the totality of the circumstances including peculiar commercial practices in the area, if the arbitrator had a financial interest in arbitration, if there was a relationship between the arbitrator and alleged favored party, and whether this relationship continued through the arbitration." *A&A Farms*, 2015 WL 4478658, at *5; see also *Cal-Circuit ABCO, Inc. v. Solbourne Computer, Inc.*, 848 F. Supp. 1506, 1509-10 (D. Colo. 1994) (applying the standard in *Ormsbee*, to conclude that unsubstantiated allegations, without direct evidence of bias, fail to provide a basis for concluding that the arbitrator was partial).

*Kansas Cases Applying Evident Partiality*

Only a handful of cases, in addition to *Griffith*, have discussed the evident partiality standard under K.S.A. 5-412(a)(2). In *Heartland Surgical Specialty Hospital v. Reed*, 48 Kan. App. 2d 237, 287 P.3d 933 (2012), the court considered vacating an arbitration award due to ex parte communications between the arbitrator and Reed's attorney in the arbitration. Despite the arbitrator's denial that an ex parte contact occurred, the record contained what appeared to the court to be strong evidence that the arbitrator and counsel for Reed engaged in a phone call in which counsel for Heartland was not involved just before Reed filed his motion to dismiss. The *Heartland* court held that any ex parte contact by the arbitrator with Reed's counsel did not corrupt the process or affect the substance of the award and the district court did not err in determining that this contact did not provide a basis for vacating the award. 48 Kan. App. 2d at 249-52. The court stated:

> "It goes without saying that the arbitrator and Reed's counsel should not have engaged in any ex parte communications about what pleadings were to be filed or about any other similar subjects. Heartland argues then that there should be a strong presumption of prejudice sufficient to vacate the award. However, we are aware of no such presumption in Kansas law. Rather, when a party files a motion to vacate an arbitration award on grounds of improper ex parte communication, the party must advance proof that the ex parte communication "'affected or played a part in the decision rendered by the arbitrators. "' *Foley*, 233 Kan. at 346. (arbitration award not procured by corruption, fraud, or other undue means where alleged ex parte communication did not affect arbitrator's decision)." 48 Kan. App. 2d at 251.

In *Foley Co., v. Grindsted Products, Inc.*, 233 Kan. 339, 662 P.2d 1254 (1983), two arbitrators in a mechanical construction dispute selected a third arbitrator as the neutral arbitrator. In addition to the ex parte communication issue, at the beginning of the

arbitration hearing, the neutral arbitrator was asked if he knew either of the parties and he replied he did not. After the award was entered, counsel for one of the subcontractors for Grindsted discovered that the neutral arbitrator had previously had some business dealings with Foley and alleged this constituted evident partiality and misconduct under K.S.A. 5-412(a)(2). The trial court refused to vacate the arbitration award finding the arbitrator's contact was minimal, isolated, and occurred over 5 years before the arbitration. The *Foley* court cited early Kansas jurisprudence involving contacts between arbitrators and parties:

"As early as *Anderson v. Burchett*, 48 Kan. 153, 29 Pac. 315 (1892), the Court recognized some contact between an arbitrator and a party might be unavoidable and was not, by itself, sufficient to set aside an arbitration award. In *Anderson* one of the arbitrators, a Mr. Kennedy, was indebted to Mr. Burchett for $50. The Court found this indebtedness was not sufficient to set aside the award, stating:

"'Another objection is, that one of the arbitrators was not disinterested and impartial, but was indebted to one of the contesting parties, and had counseled with him respecting the subject-matter of the controversy. Kennedy was indebted to Burchett to the extent of $50; but mere indebtedness of an arbitrator to one of the parties does not disqualify him. [*Wallis v. Carpenter & Another*, 95 Mass. (13 Allen) 19 (1866).] The indebtedness was small, and it is not shown that it was insecure, or that its payment depended to any extent on the result of this controversy. The interest of Kennedy, if it can be called one, was so remote and contingent that it could not, we think, have influenced him in his action, and nothing was shown in his conduct to indicate partiality or corruption.' 48 Kan. at 155.

"Both parties have cited cases in their briefs where neutral arbitrators have been held or not held evidently partial. If there is any rule which emerges from these cases it is probably best summarized by a New York Supreme Court, Appellate Division, in *Cross Properties, Inc. v. Gimbel Brothers, Inc.*, 15 App. Div. 2d 913, 225 N.Y.S.2d 1014, *aff'd* 12 N.Y.2d 806, 236 N.Y.S.2d 61, 187 N.E.2d 129 (1962).

"'The type of relationship which would appear to disqualify is one from which it may not be unreasonable to infer an absence of impartiality, the presence of bias or the

14

existence of some interest on the part of the arbitrator in the welfare of one of the parties.' 15 App. Div. 2d at 914.

The Vermont Supreme Court, in *R.E. Bean Constr. Co. v. Middlebury Assoc.*, 139 Vt. 200, 428 A.2d 306 (1980), relied upon *Cross Properties* when it commented:

"'An award should be vacated where undisclosed relationships create an impression of possible bias. However, if that rule is not "to emasculate the policy of the law in favor of the finality of arbitration," not every relationship will require that an award be vacated. *San Luis Obispo Bay Properties, Inc. v. Pacific Gas & Electric Co.*, 28 Cal. App. 3d 556, 568, 104 Cal. Rptr. 733, 741 (1972). Only relationships from which one could reasonably infer bias, not those which are "peripheral, superficial or insignificant," will require vacating the award. *Cross Properties, Inc. v. Gimbel Brothers, Inc.*, 15 App. Div. 2d 913, 914, 225 N.Y.S.2d 1014, 1016 (per curiam), *aff'd mem.*, 12 N.Y.2d 806, 187 N.E.2d 129, 236 N.Y.S.2d 61 (1962).' 139 Vt. at 207.

See also *St. Paul Ins. Companies v. Lusis*, 6 Wash. App. 205, 492 P.2d 575 (1971), *rev. denied* 80 Wash. 2d 1009 (1972), 56 A.L.R.3d 687." *Foley*, 233 Kan. at 343-44.

*Attorney-Client Relationship*

Chris argues the nature of the prior relationship between Fletcher and Fraser—an attorney-client relationship—is the kind of relationship that is held in such high regard that most reasonable people would have a hard time believing that an arbitrator could simply disregard that relationship and serve neutrally and be unbiased.

Although Kansas has not adopted the Revised Uniform Arbitration Act of 2000, 7 U.L.A. § 1 *et seq.*, pp.1-98, Chris cites § 12(a)(2) where, prior to accepting an appointment, an arbitrator must disclose "an existing or past relationship with any of the parties to the agreement to arbitration or the arbitration proceeding, their counsel or representatives, a witness, or another arbitrator." 7. U.L.A. § 12(a)(2)—Disclosure by Arbitrator, p. 46. Chris claims it is immaterial whether Fletcher's nondisclosure was unintentional. Chris argues Fletcher's nondisclosure created a reasonable impression of partiality and, thus, evident partiality under K.S.A. 5-412.

15

Lana counters Chris' argument by citing *Safeco Ins. Co. v. Stariha*, 346 N.W.2d 663 (Minn. App. 1984). In *Safeco*, Stariha was injured in a car accident and sought recovery against Safeco. The lawyers for both parties named an arbitrator and then in turn the arbitrators named a neutral third arbitrator. The fact that Stariha's attorney and the neutral arbitrator had a relationship was not disclosed to Safeco. The extent of the attorney-client relationship complained of was the third arbitrator's representation of Stariha's lawyer's law firm in a declaratory judgment action against St. Paul Fire and Marine in January 1982 seeking legal defense for the firm for certain lawsuits against it. After the third arbitrator entered a judgment for Stariha, Safeco learned of the prior attorney-client relationship with the law firm. Safeco sought vacation of the award on the grounds of undue means and evident partiality.

The *Safeco* court discussed *Commonwealth* and still denied the request to vacate the arbitration award. 346 N.W.2d at 666-68. The court held: "A remote and unrelated attorney-client relationship between the neutral arbitrator and counsel for one of the parties is not a basis to vacate an arbitration award for undue means or evident partiality." 346 N.W.2d at 666. In his response brief, Chris argues *Safeco* is distinguishable because it does not apply the same standards that the Kansas courts applied in *Griffith*, it was an unprincipled and ad hoc decision because it never articulated the standard by which the appeal was judged against, it improperly applied a "long-lasting or repeated" quantitative analysis, and it improperly stated that courts have not vacated awards merely due to an attorney-client relationship in an unrelated proceeding.

*Appointed vs. Agreed-Upon Arbitrator*

Chris also takes issue with several findings by the trial court. First, he challenges the trial court finding that Fletcher was not "appointed" as a neutral by the court and therefore his conduct was only subject to review for "corruption." Chris argues the

16

language in K.S.A. 5-412(a)(2) of "evident partiality by an arbitrator appointed as a neutral" is not limited to arbitrators appointed by the court but includes all neutral arbitrators whether appointed by the court or designated by the parties in an agreement.

K.S.A. 5-403 addresses arbitrators appointed by the court. In allowing this appointment, the statute first addresses arbitration agreements: "If the arbitration agreement provides a method of *appointment* of arbitrators, this method shall be followed." K.S.A. 5-403. Otherwise, "the court on application of a party shall *appoint* one or more abritrators." K.S.A. 5-403. Chris states the trial court provided no authority for its differentiation of arbitrators appointed by the court and those designated by an arbitration agreement. He contends there is no logical reason to apply different standards—all arbitrators should be neutral.

Lana argues there is a difference between arbitrators who are appointed by the court as a neutral and those agreed upon by the parties. Lana cites *Foley* where that court recognized: "As to the 'evident partiality' portion of the issue we note this ground for vacation is limited to a 'neutral arbitrator' (K.S.A. 5-412(a)(2), Md. Cts. & Jud. Proc. Code Ann. § 3-224(b)(2) [1980]). Mr. Taber was appointed by Mr. Foley and was not a neutral arbitrator." 233 Kan. at 344. Lana argues if a party wants stricter disclosure standards, it is up to that party to require such disclosure in the arbitration agreement. See Revised Uniform Arbitration Act (2000), 7 U.L.A. § 12—Disclosure by Arbitrator, Comment 3, p. 48 ("However, parties may agree to higher or lower standards for disclosure under Section 4(b)(3) so long as they do not 'unreasonably restrict' the right to disclosure.").

*Estoppel by Election*

Last, Chris argues the trial court erred in finding that he was prohibited from complaining about Fletcher's failure to disclose the prior attorney-client relationship due

17

to a "sense of equity similar to the equity of 'estoppel by election.'" He states the trial court provided no authority for application of this principle to the present case and that he should not be prohibited from contesting the use of an arbitrator who failed to disclose material information about a prior attorney-client relationship. Chris argues the trial court's placement of any duty on his part is inequitable when the relationship occurred between the arbitrator and his opposing counsel.

Other jurisdictions have addressed the estoppel by election remedies in more depth than Kansas. Election of remedies is a harsh doctrine. It is not a favorite of equity, and its scope should not be extended. See, *e.g.*, *Am. Sav. & Loan As'n of Houston v. Musick*, 531 S.W.2d 581, 588 (Tex. 1975). It is used to prevent rather than permit double redress for a single wrong. *Slay v. Burnett Trust*, 143 Tex. 621, 649-50, 187 S.W.2d 377 (1945). The Texas Supreme Court stated:

> "'If one having a right to pursue one of several inconsistent remedies makes his election, institutes suit, and prosecutes it to final judgment or receives anything of value under the claim thus asserted, or if the other party has been affected adversely, such election constitutes an estoppel thereafter to pursue another and inconsistent remedy.'" *Seamans Oil Co. v. Guy*, 115 Tex. 93, 99, 276 S.W. 424 (1925).

See also *Lomas & Nettleton Co. v. Huckabee*, 558 S.W.2d 863, 864 (Tex. 1977).

*Conclusion*

*Griffith* requires an arbitrator to disclose to the parties facts which create a reasonable impression of partiality. 36 Kan. App. 2d 494, Syl. ¶ 3. However, we will not apply something akin to strict liability for all failed disclosures. Otherwise, we could emasculate the nonjudicial and finality principles of arbitration. See *San Luis Obispo Bay Properties*, 28 Cal. App. 3d at 568. Only relationships from which one could reasonably

18

infer bias, not those which are peripheral, superficial, or insignificant, will require vacating the award.

There is no evidence Fletcher acted outside of his scope of authority. There are no allegations of fraud or corruption in Fletcher's award. The connections in this case did not demonstrate that Fletcher had a personal or financial interest in the outcome of the arbitration. Fletcher was not connected to either party in the case. Consequently, Fletcher's past relationship with Fraser did not have any connection with the arbitration, and there was no proximity in time between the connection alleged and the arbitration proceeding. In short, Fletcher had no personal interest in this arbitration, he had no relationship with any party to the arbitration, and Fletcher's relationship with Fraser occurred in a professional capacity over 17 years ago. Chris' arguments are nothing more than a "'disgruntled party' . . . seiz[ing] upon an undisclosed relationship' as a pretext for invalidating the award.'" See *ANR Coal Co., Inc. v. Cogentrix of North Carolina*, 173 F.3d 493, 500 (4th Cir. 1999). Chris' undisclosed connection with Fraser is not "clear evidence of impropriety"; instead, it is exactly the kind of "remote, uncertain, or speculative" allegations of partiality or bias that are wholly insufficient to justify setting aside an arbitration award. See *Ormsbee*, 668 F.2d at 1147. The trial court did not err in denying Chris' motion to vacate the judgment under K.S.A. 5-412.

Having found a lack of evident partiality in this case, we leave for another day the issues involving the difference between court-appointed arbitrators as a neutral and arbitrators designated by agreement and also the claim of estoppel by election of remedies.

Affirmed.